UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>KHALED "KAL" BASSILY,<br><br>Defendant. | COMPLAINT<br><br>Civil Action No. 16-CV-2733<br>ECF CASE<br>(Jury Trial Demanded) |

Plaintiff, the United States Securities and Exchange Commission (the "Commission"), alleges for its Complaint as follows against Khaled "Kal" Bassily:

## SUMMARY OF ALLEGATIONS

1.     This is a securities fraud enforcement action arising out of a fraudulent scheme to conceal from brokerage customers the practice of regularly charging hidden mark-ups and mark-downs on top of agreed-upon commissions on securities trades placed with a New York-based brokerage firm.  For years, Defendant Bassily, the head of the firm's transition management group, engaged in a pattern of deceptive conduct, and repeatedly directed and encouraged other employees to engage in deceptive conduct, all aimed at creating a false impression about the customers' true costs of executing securities trades.  Bassily's participation in this scheme included making and directing false statements and misleading half-truths about customers' true trade costs, coaching traders on the amount of hidden charges that could be taken without customers noticing, and encouraging the use of technological tools, false business cards, and other deceptive devices to hide the truth from customers.  The scheme resulted in millions of

1

dollars in hidden charges, dwarfing the commissions that customers had negotiated and paid, and directly enriched Bassily, who received millions of dollars in bonuses.

2.      The hidden charges at issue were referred to in the scheme as "trading profits," or more commonly, as "TP," and were in addition to the disclosed commissions paid by customers.

3.      Bassily headed the Global Transition Management group ("GTM") of ConvergEx Execution Solutions LLC.  GTM advertised itself as operating on an "agency only" basis with a transparent fee structure and no conflicts of interest.

4.      GTM, however, routinely routed transition management orders, including orders to buy and sell securities listed on U.S. exchanges, to its offshore affiliate.  The offshore affiliate took hidden TP on trades, which was in addition to, and often far more than, the disclosed commission that the customer agreed to pay GTM.  GTM's profitability largely depended on the hidden TP taken on trades for its customers.

5.      Bassily knew that customers likely were unaware that they paid TP in addition to the agreed-upon commission and would fire GTM if they learned the truth.  He also knew that prospective customers would be less likely to do business with GTM if they knew that GTM regularly would take significant TP on their trades.

6.      Accordingly, during the relevant period of October 2006 until December 2011, Bassily knowingly or recklessly participated in a fraudulent scheme by engaging in, and directing and encouraging others to engage in, repeated deceptive acts designed to hide the practice of taking TP and maximize the amount of TP that could be taken without detection by transition management customers.  By engaging in the transactions, practices, or courses of business set forth herein, Bassily also failed to conform his conduct to a standard of reasonable care.

7.     Specifically, Bassily drafted, approved and, through his subordinates, made material misrepresentations to customers and prospective customers that created a false impression regarding the true costs of executing transition management orders through GTM.

8.     Bassily also regularly communicated with ConvergEx traders at GTM's offshore affiliate to share customer information in order to maximize TP, while minimizing the risk that the customer would detect the hidden charges.  Bassily often set TP goals for trades and pressured ConvergEx traders to meet those goals.  Bassily even authorized traders to take TP in an amount that resulted in the customer unnecessarily buying at the market high of the day and selling at the market low of the day.

9.     Moreover, Bassily approved of and encouraged the use of a technological tool to trade in a transparent foreign market without exposing the taking of TP and helped to procure false business cards for a trader to use when soliciting business from a prospective customer to avoid questions that ultimately could reveal the practice of taking TP.

10.     By engaging in the misconduct described herein, Bassily directly or indirectly violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and alternatively, violated Section 10(b) and Rule 10b-5(b) through or by means of any other person, pursuant to Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)]; aided and abetted violations of Sections 15(c)(1) and 10(b) of the Exchange Act and Rule 10b-5 thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]; and violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)].

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 20(b) and (d) and

22(a) of the Securities Act [15 U.S.C. § 77t(b) and (d); 15 U.S.C. § 77v(a)] and Sections 21(d),

21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. §

1331.

12.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act

[15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts or

transactions constituting the violations of law alleged herein occurred within this judicial District

and Bassily can be found, is an inhabitant of, or transacts business in this judicial District.

13.     Bassily, directly or indirectly, made use of the means or instrumentalities of

interstate commerce, or of the mails, or the facilities of a national securities exchange in

connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANT

14.     Defendant Khaled "Kal" Bassily is 50 years old and resides in New York, New

York.

15.     At all times relevant to this Complaint, Bassily was the head of the Global

Transition Management business unit of ConvergEx Execution Solutions LLC ("CES"), and also

a managing director of CES.  Bassily was fired from CES in 2013.  At all times relevant to this

Complaint, Bassily worked in GTM's offices in New York, New York.

16.     From 1998 through 2013, Bassily was associated with broker-dealers registered

with the Commission.  During the relevant period of October 2006 until December 2011, Bassily

was a registered representative associated with CES and held various securities industry licenses,

including a Series 7 (General Securities Representative) and Series 24 (General Securities Principal).

17.     Bassily has a Master of Business Administration ("MBA") degree from Columbia University and is a Chartered Financial Analyst.

## RELEVANT ENTITIES AND INDIVIDUALS

18.     **ConvergEx Execution Solutions LLC ("CES")** is a registered broker-dealer and investment adviser and a wholly-owned subsidiary of ConvergEx Group, LLC ("ConvergEx"), a global investment services and technology firm headquartered in New York, New York.  CES also is headquartered in New York, New York.  CES has been registered with the Commission as a broker-dealer since January 1994, and as an investment adviser since September 2006.  During the relevant period, CES offered global transition management services, as well as other order execution services.  CES has been a member of the New York Stock Exchange since January 1994.  In December 2013, CES settled the Commission's claims against it for its role in the scheme described in this Complaint in an administrative proceeding. *See* SEC Rel. No. 34-71128 (Dec. 18, 2013).

19.     **ConvergEx Global Markets Limited ("CGM Limited")** was a Bermuda broker-dealer and a wholly-owned subsidiary of ConvergEx.  CGM Limited was regulated by the Bermuda Monetary Authority until 2012 when it voluntarily relinquished its securities license. In January 2012, it ceased executing trades in equities.  In December 2013, CGM Limited settled the Commission's claims against it for its role in the scheme described in this Complaint in an administrative proceeding, *see* SEC Rel. No. 34-71128 (Dec. 18, 2013), and entered a guilty plea in the United States District Court for the District of New Jersey to one count of conspiracy to

commit wire and securities fraud and one count of wire fraud in a parallel criminal proceeding instituted by the United States Department of Justice.

20.     **Jonathan Daspin** was the global head of trading of CGM Limited in Bermuda from October 2006 until his discharge in 2011.  In December 2013, Daspin settled the Commission's claims against him for his role in the scheme described in this Complaint in an administrative proceeding, *see* SEC Rel. 34-71126 (Dec. 18, 2013), and entered a guilty plea in the United States District Court for the District of New Jersey to one count of conspiracy to commit wire and securities fraud in a parallel criminal proceeding instituted by the United States Department of Justice.

## THE GTM BUSINESS MODEL

21.     During the relevant period of October 2006 through December 2011, Defendant Bassily was in charge of GTM, a former, unincorporated business division of CES.  GTM offered global transition management services, which involved executing large orders to buy and sell foreign and/or domestic securities, including securities listed on U.S. exchanges, for customers who were changing fund managers or investment strategies.  Customers seek out transition management services in order to minimize risks and preserve the value of their portfolios while in transition.  The cost paid to execute trades is a matter of importance to reasonable investors.  Many of GTM's customers shopped around to compare transition management services providers, including comparing the costs associated with executing their securities transactions.

22.     GTM provided transition management services to U.S. and international institutional customers, including funds managed on behalf of charities, religious organizations, retirement plans, universities, and governments.

23.     GTM acted as an agent on behalf of customers and charged a disclosed commission.  Customer orders were entered into an order management system, which allowed GTM to route orders offshore to its affiliate, CGM Limited.  These customer orders often included securities listed on U.S. exchanges.  Most of these orders were received in the New York office of CES, which was ConvergEx's U.S. trading arm and a member of U.S. exchanges. Instead of allowing CES to execute the orders, Bassily and others at GTM, including those under Bassily's supervision, unnecessarily routed the orders to CGM Limited in Bermuda in order to take hidden TP on the trades, only to have those trades routed to a U.S. broker for execution.

24.     To take TP on a customer order, CGM Limited acted in a riskless principal capacity.  In general, a "riskless principal" trade occurs when a broker-dealer, after receiving a customer order to buy (or sell) a security, buys (or sells) the security for its own account from (or to) another party in a contemporaneous offsetting transaction and then allocates the shares to the customer order.

25.     CGM Limited was not a market maker, and generally did not commit its own capital to facilitate customer executions or offer customers guaranteed prices.  CGM Limited thus assumed little, if any, market risk when handling and executing customer orders.

26.     With a GTM customer order in hand, CGM Limited bought or sold the securities in the customer's order for its own account through a local broker in the relevant market.  Bassily and others at GTM then advised CGM Limited's traders whether, and to what extent, they could add a mark-up or mark-down to the price received by the local broker without detection by the customer.

27.     CGM Limited marked up or marked down the price received from the local broker and kept the difference as TP.  CGM Limited then delivered the execution back to GTM,

which confirmed the trade to the customer only at the marked-up or marked-down price, which embedded the undisclosed TP amount. As a result, when CGM Limited took TP on a customer's trade, the price reported to the customer by GTM was worse than the price that CGM Limited had received from the local broker. Customers on whose orders TP had been taken received information that included the amount of commission charged, but were not informed that any mark-ups, mark-downs, or other compensation also had been taken. When a customer requested "fiduciary" treatment, CGM Limited generally did not take TP on the customer's trades, but GTM usually charged a higher commission.

28. GTM's customers typically signed transition management agreements, which generally included boilerplate language to the effect that GTM "may" effect transactions through affiliates and take a "spread." The transition management agreements gave no indication that this was in fact done routinely, including on orders involving U.S. securities. These transition management agreements also included an "Exhibit A" disclosing fees that GTM would charge. Exhibit A listed the commission rates, but did not include mark-ups or mark-downs to be taken on trades. Exhibit A typically stated that "[t]he commission schedule includes all of our charges. There are no additional management fees for our services."

29. The amount of TP taken on trades for customers often far exceeded the agreed-upon commission. It was not uncommon for the amount of TP to be several times the amount of the commission that the customer had paid GTM. For example, during the relevant period, GTM conducted securities transactions for a university, which paid GTM approximately $93,000 in disclosed commissions, but also paid approximately $543,000 in undisclosed TP. Similarly, during the relevant period, GTM conducted securities transactions on behalf of a charitable organization, which paid approximately $33,000 in disclosed commissions, but also paid

approximately $283,000 in undisclosed TP. In both cases, the transactions involved trades in only U.S. equities, yet GTM unnecessarily routed the customers' orders offshore to CGM Limited in order to take TP, even though CGM Limited had to route orders back to a U.S. broker for execution.

30.     GTM received credit within ConvergEx for the TP taken by CGM Limited on GTM customer trades. TP was important to GTM's profitability as a business unit, which in turn was a significant factor in making employee compensation determinations, including Bassily's annual bonus amounts, which were several times his base salary and totaled over $7 million during the relevant period.

### THE FRAUDULENT SCHEME TO HIDE THE PRACTICE OF TAKING TP

31.     Bassily understood that customers often were unaware of the practice of regularly taking TP and would fire GTM if they learned the truth. Bassily knew or was reckless in not knowing this from, among other things, an incident he was aware of that occurred near the start of his employment with GTM in or about 2004, when a customer learned that TP had been taken on its securities transactions, promptly demanded a refund, and never used GTM again because of the undisclosed charges.

32.     Consequently, throughout the relevant period, Bassily knowingly or recklessly participated in a fraudulent scheme to conceal from customers the practice of regularly taking TP. This scheme involved a number of different types of deceptive conduct designed to avoid raising questions that could lead customers to discover the practice of routinely taking TP on their trades and the use of affirmative misrepresentations and misleading statements to customers who did ask questions. This deceptive conduct left customers with a false impression with respect to the nature and amount of the costs they paid to have their trades executed, which is a

matter of importance to a reasonable investor.  As a result of the deception, GTM was able to

continue doing business with these customers, including continuing to take TP on their trades,

and GTM was able to solicit new customers and take TP on their trades.

***Misrepresentations to Customers Who Inquired About the GTM Business Model***

33.     To conceal the practice of routinely taking TP, Bassily helped to draft, explicitly

approved, and ultimately directed subordinate employees to make, certain misrepresentations and

material omissions to customers who asked how ConvergEx was compensated for transition

services after TP had been taken on their trades.  The objective and result of these

misrepresentations was to keep the practice of regularly taking TP concealed from the customer

and the market in general so that GTM could continue to obtain orders for securities transactions,

which in turn could be routed to CGM Limited in order to take TP.

***Customer A***

34.     Customer A had a long-standing relationship with GTM pursuant to a transition

management agreement that required GTM to obtain Customer A's agreement to effect

transactions on a principal basis and take a "spread" (TP).

35.     In July 2010, a representative of Customer A sent an e-mail to Bassily's

subordinate, Employee 1, and asked "if BNY Convergex is currently engaged in earning a spread

on a principal basis."  Employee 1 responded that "some asset classes require trading to be

undertaken on a principal basis, for example, Foreign Exchange."  This response, however, did

not satisfy the representative of Customer A, and she persisted in her questions by asking,

"[o]ther than FX transactions, is there anything else that BNY Convergex can engag[e] on a

principal basis?"

36.     Employee 1 consulted Bassily and sought Bassily's approval on her proposed response to the customer.

37.     In an email, Bassily approved of Employee 1's proposed response to Customer A's inquiry and directed Employee 1 "[p]lease send on to" Customer A.  Pursuant to Bassily's direction, Employee 1 emailed the response to Customer A's representative on or about July 24, 2010, which stated in part:

> We have the ability to engage in principal trading, however this is rarely used in our transition business . . . , and we can assure you that no principal trading has been carried out in any transition for [Customer A].

> Should it ever be necessary, prudent or strategically important to do so, we would always discuss and seek your approval.

38.     As Bassily was aware, this statement was false and misleading.  At the time of this misrepresentation, CGM Limited, GTM's affiliate, had taken approximately $9.6 million in undisclosed TP on trades effected on a riskless principal basis for this customer.

39.     The representative for Customer A believed that Customer A only paid commissions when GTM executed its transition management orders and it was important to the representative for Customer A to know whether GTM or its affiliates took mark-ups or mark-downs in addition to that.  Commissions, however, were only a small fraction of the charges that Customer A paid to execute trades through GTM.  Indeed, for the trades Customer A placed with GTM prior to July 24, 2010, Customer A paid approximately $600,000 in commissions, which was dwarfed by the hidden TP taken on these trades, totaling well over $9 million.

40.     Following this misrepresentation, Customer A paid GTM an additional $118,000 in agreed-upon commissions, while CGM Limited took approximately $4.5 million in additional concealed TP on Customer A's trades routed from GTM (of which approximately $1.7 million was taken on securities listed on U.S. exchanges).

### Customer B

41.     Between May and June 2008, Bassily drafted and/or approved misrepresentations and misleading statements that were communicated to a transition management consultant who represented Customer B.  Customer B's consultant made specific and repeated inquiries to Bassily's subordinate, Employee 2, asking whether GTM — or any ConvergEx company — earned remuneration from transitions other than commissions.

42.     The misrepresentations drafted and/or approved by Bassily created a false impression that routing orders to an affiliate and taking TP was a possibility only under certain limited circumstances when needed to facilitate the execution of a difficult order and that it was difficult to determine the amount of TP taken in these circumstances.

43.     In an e-mail dated May 23, 2008, Customer B's consultant asked Employee 2 if he would confirm that GTM and its related parties had not received "any income or remuneration in excess of the agreed upon commission."  Knowing that a truthful response would reveal TP, Employee 2 wrote to Bassily that this inquiry was "my worst fear.  What do we say now?"

44.     Employee 2 further wrote that telling the customer the truth would be a problem because ConvergEx recently took "significant" TP on a transition for Customer B and if the consultant found out, he "would be unhappy, ruin the relationship . . . and kill [GTM's] developing . . . business" in a particular foreign market.

45.     After Customer B's consultant again asked Employee 2 "if related parties earned any remuneration and how such remuneration would arise," and then requested "information of any additional remuneration earned," Bassily helped to draft and approved the following false and misleading statement, which was emailed to Customer B's consultant on or about June 10, 2008:

It appears that one of our related parties, depending on the local market, can act in a principal capacity to facilitate our transition executions in a timely manner. In such cases, the party takes some positions onto its own inventory and unwinds them later. Since the unwinding is done over a period of time and 'piecemeal', I am told it is very difficult, if not impossible to determine the profit or loss that may have resulted. . . . .

46.     The statement went on to explain that with respect to Customer B's transition between November and December 2007:

. . . In order to complete and to avoid possibly incurring a large opportunity cost [CGM Limited] facilitated execution as above. In fact, due to the lengthy actual settlement process, they had open positions for a long time. These positions were their exposure and [Customer B] did not incur the impact of that.

47.     Bassily knew, or was reckless in not knowing, that these statements were false or misleading because: (a) Bassily was aware that TP was taken frequently as part of the GTM business model, and not on a limited basis to facilitate a trade; (b) Bassily knew that it was not difficult to track TP because he tracked TP taken on customer trades on a regular basis; (c) Bassily was aware that Customer B's transition between November and December 2007 was GTM's most profitable transition during that period and that CGM Limited had taken more than $3.2 million in TP in that transition alone because these facts were included in the TP reports that were received by and written by Bassily; and (d) CGM Limited traded on a riskless principal basis and did not take trades into "inventory" or have "exposure" as a result of these trades.

48.     If Customer B's transition management consultant had known that CGM Limited was taking large amounts of TP in addition to the commission, the consultant would not have considered using GTM for Customer B's transition and would have stopped using GTM for its transition customers' business.

49.     After the misleading statement was made, Customer B continued to place orders for securities transactions with GTM. GTM also continued to develop its business in that foreign

market, obtaining new transition management orders for securities transactions, which resulted in millions of dollars of hidden TP.

### Customer C

50.     On or about March 14, 2011, ConvergEx executed a buy order for Customer C for a German exchange traded fund ("ETF"), for which Customer C paid GTM approximately $3,700 in disclosed commission.  CGM Limited bought the ETF in the relevant market for approximately 63.76 Euro per share and then marked up the price and sold the ETF to Customer C for approximately 63.80 Euro per share, which resulted in CGM Limited taking $53,039.04 in undisclosed TP in addition to the disclosed commission that Customer C paid to GTM.

51.     On or about March 15 and 17, 2011, one of Bassily's subordinates, Employee 3, notified Bassily by email that Customer C was "really unhappy" with the execution on this trade and that Employee 3 needed "to explain briefly but convincingly what happened."

52.     Employee 3, who did not know about CGM Limited's practice of taking TP and did not know that TP had been taken on Customer C's order, asked Bassily:

> Do you think the trading desk could have made a spread on the trade without us knowing?  . . . I know we are agency brokers and we are not making money on these trades but at the same time I want to make sure that we sort the issue with [Customer C's representative] without it affecting our transition business.

53.     Bassily responded by email, asking for the source of Employee 3's information.

54.     Employee 3 then copied Bassily on an e-mail in which Employee 3 wrote that "we need to convince [Customer C] that we are not skimming off the top and that we just had a bad execution day."

55.     Bassily did not correct Employee 3's false understanding about "spread" (TP) or advise Employee 3 that he should not be trying to convince the customer that ConvergEx was not "skimming off the top" because CGM Limited had, in fact, marked up the execution price

14

received from the local broker. Rather, Bassily emailed Employee 3 and stated that this "might contaminate our business on the manager transitions side" which "would be a tragedy." Bassily authorized Employee 3 to "level" with the customer by explaining the execution with detailed information regarding the nature of the market and ConvergEx's trading capabilities. The explanation that Bassily authorized Employee 3 to provide to Customer C omitted any reference to the $53,039.04 in TP as a factor in the price the customer received. Bassily, who tracked TP on a daily basis, knew, or was reckless in not knowing, that TP had been taken on Customer C's trade and that TP impacted the price received by Customer C.

56.     Employee 3 communicated the misleading explanation approved by Bassily to Customer C's relationship managers at a bank for the purpose of communicating the information to Customer C.

57.     CGM Limited subsequently took approximately $3.5 million in additional TP on trades for Customer C, of which approximately $600,000 was taken on trades in securities listed on U.S. exchanges. This was in addition to approximately $346,000 in agreed upon commissions that Customer C paid to GTM.

*TP Taken Opportunistically to Avoid Detection*

58.     Bassily took further steps to conceal the practice of frequently taking TP by communicating with CGM Limited traders to provide guidance on opportunistically taking TP in order to minimize the risk that customers would detect the charge and maximize the amount of TP that could be taken without detection.

59.     To this end, Bassily and others at GTM generally assessed the sensitivity of their customers to determine whether a particular customer was paying attention to price — that is, how the prices the customers were paying for trades compared to prices available in the market

— and communicated that information to the CGM Limited traders.  CGM Limited then took less TP, or did not take TP at all, on trades for sensitive customers.

60.     For example, in a recorded call on or about March 1, 2011, Daspin explained to Bassily that a customer — Customer C, described above — was monitoring a trade by asking for periodic updates on trade execution throughout the trading day, which meant the customer would likely be able to detect that TP was being taken on its trades.  As Daspin put it, this would prevent Bassily from "raping" the customer by taking large amounts of TP.

> Daspin: … yes, it's a big piece of the liquidity, but that's not going to prevent me from completing [the trade], but it does prevent you from raping if you know what I mean.
>
> Bassily:  Why?
>
> Daspin:  . . . . First of all, the client according to your guy is asking for update.

61.     Later in the same recorded call, Bassily informed Daspin about an upcoming transition that "would be probably the biggest transition of the year."  Bassily said "I have to have this conversation with you offline," and that even though he and Daspin would be speaking with other colleagues about the trading strategy, "I'm just having this conversation just you and me."  Bassily then informed Daspin "I'm looking to get 10 million out of this trade."  Bassily then explained to Daspin which transition consultants on the upcoming transition did and did not make a practice of requesting post-trade details that could reveal that CGM Limited had taken TP.  Daspin responded "when we take TP at the end of the day we know which names to focus less on."  Bassily agreed and reiterated, "I just want to have the ten million conversation just one-on-one with you."  After Bassily and Daspin further discussed ways of achieving Bassily's goal of taking $10 million in TP on the transition, Daspin said "Let's make a ton of money….I'm excited.  You're excited.  This is great."  Bassily responded:  "I am.  I am.  Great."

62.     In certain instances when Bassily and others perceived the risk of detection to be low, they communicated that information to traders at CGM Limited and directed them to take more TP, in some cases even advising traders that they could mark up the customer's trade so that the customer's price was the market high of the day (for a buy order) or the market low of the day (for a sell order), where better prices could have been provided.  Bassily also directed Daspin to take TP in a manner that would avoid customer scrutiny.  The end result of the collaboration between Bassily and CGM Limited traders on customer sensitivity was that some customers received worse execution prices than they would have received if the information about the customers had not been shared.

63.     Similarly, prior to CGM Limited executing a trade, Bassily set goals for how much TP he wanted to take on the trade and he communicated that to the traders in Bermuda.  In this regard, the amount of TP taken was not necessarily based on the customer receiving better performance, and Bassily pressured CGM Limited to take TP to meet his goals as much as possible.

64.     For example, in a recorded call on or about June 23, 2011, Daspin stated that volatility in the market helps for the "real plan" of taking TP and that a flat or "slightly up market with better performance" would not help reach Bassily's goals for TP.  Bassily told Daspin that Daspin could take more TP if he was able to explain the marked up price to the customer by "just fram[ing] that basically in the context of the market behavior."  Daspin said "I'll leave that for you to worry about.  How much do you want me to take?"

65.     Similarly, in a recorded call on or about August 2, 2011, Bassily and Daspin discussed how much TP could be taken on upcoming trades, and Daspin noted that CGM Limited had been taking about 30 basis points in TP on trades involved in that transition.  Bassily

asked "[i]s there any room we can take some more today without looking very ugly?" When Daspin said "I'll check … "[w]e're still working on it," Bassily reminded Daspin "[w]e'll need to have a good story, right?"

***Deceptive Conduct to Hide TP in a Transparent Market***

66.     Bassily also helped to hide TP by approving and encouraging Daspin to use a technological tool to hide broker identification for trades executed in a transparent foreign market in order to take TP while minimizing the risk of detection by Customer D.  Customer D had not requested anonymity in the execution of its trades.

67.     Specifically, in a recorded call on or about June 17, 2011, Daspin explained to Bassily that he was concerned about a GTM trade because, "[i]t's all Canada and it's all transparent," meaning that for trades on the Canadian Securities Exchange, unlike most securities exchanges, real-time trade execution data, including the identity of the broker executing the trade, is available to the general public.  This meant that GTM customers would be able to see the real prices obtained on their trades.  Daspin told Bassily that "focusing on how to hide myself best…is my priority.  Not anything else.  Not cost, nothing.  I have to figure out how to hide myself."  Daspin explained that a ConvergEx subsidiary had an algorithm that randomized trades between local Canadian brokers and that Daspin also could present himself as "anonymous," both of which would impede GTM customers from learning that TP was being added to the prices obtained in their securities transactions.  Bassily responded enthusiastically to the use of the randomizer to execute the trade, saying, among other things, "Wow," and after discussing Daspin's plan for the transition and Bassily's goals for the amount of TP to be taken, Bassily ended the call by saying "Great plan.  I love it."

68.     CGM Limited took approximately $1.3 million in undisclosed TP on this trade for Customer D (in addition to disclosed commissions in the amount of about $43,000).

69.     After CGM Limited executed these trades for Customer D, Daspin reported to Bassily in a recorded call that one of the stocks did not perform well, but that he had an idea for how they still could take TP.

70.     Specifically, Daspin told Bassily that even though the stock did not perform well, since CGM Limited had executed a portion of the order earlier in the day when the price was better, they could falsely tell Customer D that they waited until the end of the day to execute the trade, hoping for a rebound in the price.

71.     Bassily expressed excitement, saying "I love this brilliant idea," and he urged Daspin to make sure that he was telling the other CGM Limited traders about ideas like this one. Bassily then told Daspin that ConvergEx senior management had reminded him that June 2011 was a critical month for GTM revenue and Bassily had promised management that he would not leave a "penny on the table" and that "we go to the edge." Daspin replied that he would "push the envelope." CGM Limited took approximately $47,000 in undisclosed TP on that trade for Customer D.

72.     CGM later took approximately $225,000 in additional TP on this customer's subsequent trades, in addition to over $70,000 in agreed-upon commissions Customer D paid to GTM.

73.     A representative of Customer D believed that ConvergEx earned only the stated commissions on open market trades and there were no other fees. If Customer D had known about ConvergEx's practice of routinely taking TP on such trades, that information would have affected its decision to hire GTM.

***Deceptive Conduct to Prevent a Prospective Customer from Learning About GTM's Use of An Offshore Trader***

74.     Bassily also engaged in deceptive conduct to prevent a prospective transition management customer from discovering that its trades would be executed by CGM Limited in Bermuda.  Revealing this could have led to questions to which truthful answers would have revealed that GTM was routing trades offshore in order to take TP.  The prospective customer asked to meet with the trader who would be handling its trades if it hired GTM, and Daspin was selected to accompany Bassily on the trip to meet the prospective customer.

75.     Bassily, however, did not want Daspin to provide the prospective customer with business cards that truthfully indicated that he was employed by CGM Limited in Bermuda, so Bassily and another member of senior management sought to order new business cards that falsely stated that Daspin was employed by ConvergEx Group in New York.

76.     Bassily provided Daspin with the cards, which were provided to the prospective customer on the trip.

77.     In a recorded phone call on or about April 8, 2011, while preparing for the trip, Daspin explained to Bassily that the prospective customer might be able to look him up and see that he worked in Bermuda.

78.     Bassily responded by proposing a false statement that they could tell the customer:

> Let me think about that.  I mean, we could very well – we could say that we have a, you know, trading operation down in Bermuda.  You used to be based in Bermuda, right, but now you're based in New York. . . we can come up with something . . . most likely we'll go with the New York business card . . . I'd rather go with the New York business card and spin it. . . .

*Misleading Marketing Materials*

79.     As set forth above, GTM routinely routed transition management customer orders to its affiliate, CGM Limited, which charged undisclosed TP in addition to GTM's disclosed commission.  Despite this, from at least 2006 to 2011, GTM marketed itself as an "agency-only brokerage" that was "free of conflicts" and had a "very transparent" compensation structure. GTM represented that it "charges a stated agency brokerage commission, agreed with our client in advance," which "covers all functions of our transition management service," and it did not "charge any additional project management, operational or reporting fees."

80.     Bassily was well aware of how GTM marketed its services because he reviewed and approved many of GTM's marketing materials that contained these representations, including those set forth in the preceding paragraph.

81.     Bassily also personally drafted and communicated these statements to prospective customers.  For example, on October 13, 2010, Bassily sent an email to a prospective customer who had asked Bassily what features differentiated GTM from other transition managers.  In response, Bassily stated:

> … I also believe that we, ConvergEx, can add value because we can provide everything you mentioned and do it in an agency manner.  The fact that we are an agency-only brokerage firm aligns our interests with those of our clients.  This is a big differentiating factor….

82.     Bassily knew, or was reckless in not knowing, that this statement was false or misleading.  Despite claiming that ConvergeEx was an "agency-only brokerage," Bassily knew that orders were routinely routed to GTM's affiliate, CGM Limited, which traded on a riskless principal basis and added an undisclosed mark-up or mark-down to the price of the security.

83.     In addition, on June 11, 2010, Bassily emailed language containing

misrepresentations to a colleague for use in response to an inquiry from a prospective customer.

The language provided by Bassily stated, in part:

> . . . all our trading activity is carried out on an agency basis whereby we trade on
> behalf of customers. We are bound by the guidelines governing best execution.
> The risks that a fiduciary contract safeguards against do not exist in an agency-
> only business model. In fact, we have chosen that model to operate our business
> because it is free of conflicts and aligns us totally with our customers. Our
> behavior does not change depending on the type of contract we enter.

84.     This misrepresentation was communicated to the prospective customer on or

about June 15, 2010.

85.     Bassily knew, or was reckless in not knowing, that this statement was false or

misleading.  Bassily knew that customers who requested "fiduciary" treatment received different

treatment from GTM, as TP was not taken on trades for these customers.  Bassily also knew that

trades for non-fiduciary customers were routinely routed to CGM Limited, which traded on a

riskless principal basis and added an undisclosed mark-up or mark-down to the price of the

security.

86.     Similarly, on November 11, 2010, Bassily emailed language containing

misrepresentations to a colleague for use in response to an inquiry from a prospective customer,

who had asked whether ConvergEx "will utilize its affiliates and are the cost of these affiliates

accounted for and disclosed?"  Bassily provided the following misleading response to his

colleague:

> We operate a global trading platform whereby we do not outsource trading to third
> parties.  We trade through our own execution desks.  Our execution desks utilize a mix of
> algorithms that are designed to minimize implementation shortfall and access global
> markets in the most efficient and timely manner.  We are an agency-only brokerage firm.
> We only trade on behalf of our clients and our mandate is to get best execution.  All the
> costs are accounted for in the form of the commission rate we have quoted.

87.     This misrepresentation was communicated to the prospective customer by email on or about November 16, 2010.

88.     Bassily knew, or was reckless in not knowing, that this statement was false or misleading.  Despite representing that ConvergEx acted on an agency-only basis, Bassily knew that GTM routinely routed orders to CGM Limited, which traded on a riskless principal basis and added an undisclosed mark-up or mark-down to the price of the security, resulting in customers receiving different prices for securities than those obtained by the local broker in the relevant market.  Further, Bassily knew that undisclosed TP was routinely taken on transition management trades, such that "[a]ll the costs" were not in fact "accounted for in the form of the commission rate."

## FIRST CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

89.     Paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

90.     Through the conduct described above, Bassily violated Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 thereunder  [17 C.F.R. § 240.10b-5].

91.     Bassily, directly or indirectly, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

92.     By reason of the forgoing, Bassily has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

**In the Alternative with Respect to Section 10(b) and Rule 10b-5(b):**
**Violation of Sections 10(b) [15 U.S.C. § 78j(b)] and 20(b) of the Exchange Act [15 U.S.C. §78t(b)] and Rule 10b-5(b) Thereunder [17 C.F.R. § 240.10b-5(b)]**

93.     Paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

94.     Bassily violated Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] by knowingly or recklessly drafting, approving and/or directing the communication of materially false and misleading information through or by means of employees under his management that were intended to be, and were, communicated to brokerage customers in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

95.     By knowingly or recklessly communicating materially false and misleading information through or by means of employees under his management, Bassily, directly or indirectly, engaged in acts through or by means of any other person or persons that would have been unlawful for Bassily to do himself under Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

96.     Unless restrained and enjoined, Bassily will continue to engage in acts through or by means of third parties that would have been unlawful for Bassily to do himself under Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5] Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]**

97.    Paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

98.    Through the conduct described above, CES, CGM Limited and Daspin, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

99.    Bassily knowingly or recklessly provided substantial assistance to CES, CGM Limited and Daspin in their violations of Section 10(b) of the Exchange Act and Rule 10b-5. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Bassily is deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as CES, CGM Limited and Daspin, and unless enjoined, will again aid and abet violations of those provisions.

### FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78o(c)(1)] Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]**

100.    Paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

101.    At all relevant times, CES was a registered broker-dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

102.    Through the conduct alleged above, CES by use of the mails or any means or instrumentality of interstate commerce effected any transaction in, or induced or attempted to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) by means of any manipulative, deceptive, or other fraudulent device or contrivance in violation of Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78o(c)(1)].

103.    Bassily knowingly or recklessly provided substantial assistance to CES in its violations of Section 15(c)(1) of the Exchange Act.

104.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Bassily is deemed to be in violation of Section 15(c)(1) of the Exchange Act to the same extent as CES, and unless enjoined, will again aid and abet violations of that provision.

## FIFTH CLAIM FOR RELIEF

**Violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)]**

105.    Paragraphs 1 through 88 are re-alleged and incorporated herein by reference.

106.    Through the conduct described above, Bassily, directly or indirectly, in the offer or sale of any security by use of the means or instruments of interstate commerce, or by use of the mails, (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; and (b) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

107.    By reason of the foregoing, Bassily has violated, and unless enjoined will again violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.      Finding that Defendant Bassily violated the federal securities laws and the Commission Rule alleged in this Complaint;

B.      Permanently restraining and enjoining Defendant Bassily from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder through or by means of any other person, as prohibited by Section 20(b) of the Exchange Act, from aiding and abetting any violation of Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78o(c)],  and from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

C.      Ordering Defendant Bassily to disgorge all illegal profits obtained as a result of his fraudulent misconduct, acts, or courses of conduct described in this Complaint, and to pay prejudgment interest thereon;

D.      Imposing civil monetary penalties on Defendant Bassily pursuant to Section 20 of the Securities Act [15 U.S.C. § 77t] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)]; and

E.      Granting such equitable relief as may be appropriate or necessary for the benefit of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

Dated:  April 12, 2016

Respectfully submitted,

Derek S. Bentsen (Bar No. DB8369)
Thomas A. Bednar
Sarah L. Allgeier
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985
202-551-6426 (Bentsen)
202-551-6218 (Bednar)
202-772-9245 (Fax)
BentsenD@sec.gov
BednarT@sec.gov
AllgeierS@sec.gov