UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| U.S. SECURITIES AND EXCHANGE COMMISSION,<br><br>        Plaintiff,<br><br>        v.<br><br>KHALED "KAL" BASSILY,<br>        Defendant. | No. 16-CV-2733 (AT) |

UNITED STATES SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS

Thomas A. Bednar
U.S. Securities & Exchange Commission
100 F Street, N.E.
Washington, D.C. 20549-5985
(202) 551-6218 (Bednar)
BednarT@sec.gov
*Counsel for Plaintiff*

Dated: August 2, 2016

**TABLE OF CONTENTS**

INTRODUCTION..........................................................................................................................1

STANDARD OF REVIEW .........................................................................................................2

BACKGROUND ..........................................................................................................................3

   I. The Fraudulent Scheme ..........................................................................................................3

      A. GTM's Business Model Was Built on Taking Hidden Charges ........................................3

      B. Bassily's Fraud Was Built On Keeping His Customers in the
      Dark in Order to Keep the Money Coming ........................................................................5

         1. Step One: Conditioning the Market With a False Impression
         of GTM As Conflict-Free, Agency-Only, and Transparent ......................................6

         2. Step Two: Taking Profits on Riskless Trades in Amounts That
         Would Keep It Concealed and Using Other Deceptive Devices
         to Conceal the Real Cost of Customers' Transactions ...............................................6

         3. Step Three: Using Misleading Half-Truths, Spin, and When All
         Else Failed, Lying to Customers to Perpetuate the False Impression..........................7

   II. The Complaint Adequately Pleads Violations of the Relevant Securities Laws............................9

      A. The SEC's Fraud Allegations ...........................................................................................9

      B. The "Spread" Language in the Contracts is Not Fatal to the Commission's Claims..........11

         1.   The Contracts Did Not Legalize Bassily's Deceptive Conduct ................................12

         2.   The Language in the Contracts Did Not Disclose the Conduct
         That is the Basis of the Fraud...................................................................................15

         3.   Bassily's Arguments Related to the Contracts Raise Factual Issues
         That Cannot Be Resolved on a Motion to Dismiss....................................................16

         4.    Deceptive Conduct Directed to Prospective Customers is Actionable ...................17

   III. The Supreme Court's *Morrison* Decision Does Not Bar The SEC's Claims ................................19

      A. The Complaint Alleges Domestic Transactions in Non-U.S. Securities .............................20

      B. The Complaint Alleges Transactions in Domestic Securities .............................................23

      C. *Morrison* Does Not Bar the SEC's Claims for Violating Securities Act Section
      17(a) and Aiding and Abetting Violations of Exchange Act Section 15(c)(1) ...................24

D. The Conduct-or-Effects Test Applies to Bassily's Post-Dodd-Frank Conduct ............ 26

CONCLUSION ……….....................................................................................……………………30

# TABLE OF
# AUTHORITIES

**Cases**                                                                                           **Page(s)**

*Aaron v. SEC,*
    446 U.S. 680 (1980).................................................................................................10

*Absolute Activist Value Master Fund Ltd. v. Ficeto,*
    677 F.3d 60 (2d Cir.2012) ......................................................................................21

*Arbaugh v. Y&H Corp.,*
    546 U.S. 500 (2006) ...............................................................................................28

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..................................................................................................2

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC,*
    2 F. Supp. 3d 550 (S.D.N.Y. 2014) ........................................................................22

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
    493 F.3d 87, 101 (2d Cir. 2007) ............................................................................12

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) .................................................................................................2

*Butler v. United States,*
    992 F. Supp. 2d 165 (E.D.N.Y. 2014) ...............................................................21, 22

*CFTC v. Wilson,*
    27 F. Supp. 3d 517 (S.D.N.Y. 2014) .................................................................2, 11

*Chambers v. Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002)   .................................................................................2

*City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG,*
    752 F.3d 173 (2d Cir. 2014) ...................................................................................21

*Cognex Corp. v. Microscan Sys., Inc.,*
    990 F. Supp. 2d 408 (S.D.N.Y. 2013) .....................................................................3

*Cornwell v. Credit Suisse Group,*
    729 F. Supp. 2d 620 (S.D.N.Y. 2010) ...................................................................27

*First Bank of the Ams. v. Motor Car Funding,*
    257 A.D.2d 285 (N.Y. App. 1999) .........................................................................14

*Gelles v. TDA Indus., Inc.*,
 90-CV-5133 (MBM), 1991 WL 39673 (S.D.N.Y. March. 18, 1991)............................24

*Global Network Comms., Inc. v. City of New York*,
 458 F.3d 150 (2d Cir. 2006) .........................................................................11, 17

*Hunt v. Alliance N. American Gov't Income Trust, Inc.*,
 159 F.3d 723 (2d Cir. 1998) .........................................................................15

*INS v. Nat'l Ctr. For Immigrants' Rights, Inc.*,
 502 U.S. 183  (1991) ....................................................................................28

*Kuehnert v. Texstar Corp.*,
 412 F.2d 700 (5th Cir. 1969) .......................................................................18

*Liu v. Siemens A.G.*,
 13-CV-317 (WHP), 2013 WL 5692504 (S.D.N.Y. Oct. 21 2013)...................................27

*Morrison v. Nat'l Australia Bank Ltd.*,
 547 F.3d 167 (2d Cir. 2008) .........................................................................28

*Morrison v. National Australia Bank*,
 561 U.S. 247 (2010)................................................................................passim

*United States ex rel. O'Donnell v. Countrywide Home Loans, Inc.*,
 822 F.3d 650 (2d Cir. 2016)........................................................................13, 14

*In re Optimal U.S. Litig.*,
 865 F. Supp. 2d 451 (S.D.N.Y. 2012) .............................................................27

*Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*,
 763 F.3d 198 (2014) ...................................................................................30

*Quail Cruises Ship Mgt. Ltd. v. Agencia de Viagens*,
 645 F.3d 1307 (11th Cir. 2011) ....................................................................23

*SEC v. Adoni*,
 60 F. Supp. 2d 401 (D.N.J. 1999) .................................................................18

*SEC v. Amerindo Inv. Advisors, Inc.*,
 05-CV-5231 (RJS), 2014 WL 405339 (S.D.N.Y. Feb. 3, 2014) .....................................21

*SEC v. Blumberg*,
 14-CV-4952 (KM) (Mem. & Order) (D.N.J. Feb. 25, 2016) ...........................10, 11, 24

*SEC v. A Chicago Convention Ctr, LLC*,
 961 F. Supp. 2d 905 (N.D.Ill. 2013) .............................................................30

*SEC v. Collins & Aikman Corp.*,
   524 F. Supp. 2d 477 (S.D.N.Y. 2007) ............................................................3

*SEC v. Compania Internacional Financiera SA*,
   11-CV-4904, 2011 WL 3251813 (S.D.N.Y. July 29, 2011) ...........................27

*SEC v. First Jersey Sec., Inc.*,
   101. F.3d 1450 (2d Cir. 1996)........................................................................10

*SEC v. Ginder*,
   752 F.3d 569 (2d Cir. 2014).............................................................................12

*SEC v. Goldman Sachs & Co.*,
   790 F. Supp. 2d 147 (S.D.N.Y. 2011) ............................................................25

*SEC v. Gruss*,
   11-CV-2420, 2012 WL 3306166 (S.D.N.Y. Aug. 13, 2012) ..........................27

*SEC v. Hopper*,
   04-CV-1054, 2006 WL 778640 (S.D. Tex. Mar. 24, 2006) .............................18

*SEC v. Levine*,
   462 Fed. Appx. 717 (9th Cir. 2011) ...............................................................22

*SEC v. Pentagon Capital Mgt. PLC*,
   612 F. Supp. 2d 241 (S.D.N.Y. 2009) ............................................................12

*SEC v. Rana Research, Inc.*,
   89-CV-1865, 1990 WL 267365 (C.D. Cal. Oct. 2, 1990),
   *aff'd* 8 F.3d 1358 (9th Cir. 1993) ................................................................18

*SEC v. Tourre*,
   No. 10 Civ. 3229 (KBF), 2013 WL 2407172 (S.D.N.Y. June 4, 2013) ...................25, 27

*SEC v. Simpson Capital Mgt., Inc.*,
   586 F. Supp. 2d 196 (S.D.N.Y. 2008) .......................................................12, 17

*TRW Inc. v. Andrews*,
   534 U.S. 19 (2001) ...........................................................................................28

*United States v. Coyle*,
   63 F.3d 1239 (3d Cir. 1995) ...........................................................................14

*United States v. Frank*,
   156 F.3d 332 (2d Cir. 1998)............................................................................14

*United States v. Georgiou*
   777 F.3d 125 (3d Cir. 2015) ........................................................ . 23

*United States v. Isaacson,*
   752 F.3d 1291 (11th Cir. 2014).....................................................22

*United States v. Mandell,*
   752 F.3d 544 (2d Cir. 2014) .........................................................22

*United States v. Naiman,*
   211 F.3d 40 (2d Cir. 2000).............................................................14

*United States v. Sumeru,*
   449 Fed. Appx. 617 (9th Cir. 2011) ............................................ 25

*United States v. Svete,*
   556 F.3d 1157 (11th Cir. 2009) ...................................................14

*United States v. Vilar,*
   729 F.3d 62 (2d Cir. 2013) .......................................................21, 22

*Xechem Inc. v. Bristol-Myers Squibb Co.,*
   372 F.3d 899 (7th Cir. 2004) .........................................................3

**Statutes**

15 U.S.C. § 77q(a)(1) ......................................................................10, 17

15 U.S.C. § 77q(a)(3) ......................................................................10, 17

15 U.S.C. § 77v(a) .......................................................................... ....27

15 U.S.C. § 77v(c) ...............................................................................27

15 U.S.C. § 78j(b) ...............................................................................9

15 U.S.C. § 78t(b) ............................................................................. 10

15 U.S.C. § 78t(e) ............................................................................. 10

15 U.S.C. § 78o(a)(1) ....................................................................... 10

15 U.S.C. § 78o(c)(1)…........................................................................25

15 U.S.C. § 78aa(a) ............................................................................27

15 U.S.C. § 78aa(b)..............................................................................27

15 U.S.C. § 80b-14(a) ...............................................................................................27

**Other Authorities**

17 C.F.R. § 240.10b-5..........................................................................................9, 17

Investor Protection Act of 2009, H.R. 3817 (111th Cong., 2d Sess.) § 216 ............................29

Committee Report on the Investor Protection Act of 1009, H.R. Rep. 111-687
    (Dec. 16, 2010) ...............................................................................................29

156 Cong. Rec. H5237 (daily ed. Jun. 30, 2010) .........................................................29

156 Cong. Rec. 105, S5915-16 (July 15, 2010) ...........................................................29

## INTRODUCTION

Defendant Khaled Bassily has moved to dismiss a Complaint filed by the Securities and Exchange Commission ("Commission" or "SEC") that alleges he was a leading player in a long-term fraudulent scheme to deceive brokerage customers about the cost of their securities transactions.  The Complaint further alleges that Bassily contributed to the scheme's success by using deceptive tricks, misleading half-truths, and lies to keep customers from learning that his firm took extensive hidden charges on their securities transactions, on top of agreed-upon commissions.  As a result, Bassily's Motion is doomed because it fails to address the strength of the securities fraud claims set forth in the Complaint.

Bassily moves to dismiss on two grounds.  First, he argues there was no fraud because customer contracts disclosed what was going on.  But this case centers on a fraudulent cover up, which was never disclosed.  Customers never signed away their right to learn the true costs of their trades, or the right to get an honest answer to a straight question.  Indeed, Bassily can only support this argument by attacking straw-men that are not found in the Complaint.  For example, Bassily's Motion focuses on whether he had a duty to disclose certain information to his customers.  This issue is not relevant because the Commission does not allege mere nondisclosure.  Rather, it alleges that Bassily lied and used deceptive conduct to create a false impression that customers were receiving commission-based, agency-only services with no added charges when, in reality, customers routinely paid hidden charges that dwarfed the commissions.  The law permits a claim like this to go forward — as this one should.

Second, Bassily asserts that the Commission's allegations are barred by the Supreme Court's decision in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), which limits the extraterritorial reach of the U.S. securities laws.  Bassily's arguments largely ignore the impact of the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"), which

1

took effect on July 22, 2010, on Bassily's conduct in the latter half of 2010 and throughout 2011. Regardless, the Complaint amply satisfies the *Morrison* test by describing a scheme that was operated from within the United States, in part through a U.S. broker-dealer, and that involved customers in the United States and millions of dollars of hidden charges taken on securities listed on U.S. exchanges and in domestic transactions in other securities.  Thus the federal securities laws apply to the Commission's claims, whether the Court applies the *Morrison* test or the conduct-or-effects test that governs Bassily's conduct after the Dodd-Frank Act took effect.

As set forth in more detail below, neither of the arguments in Bassily's Motion have merit.  The Complaint adequately alleges fraud in violation of both Section 10(b) of the Exchange Act, Rule 10b-5 thereunder, and Section 17(a) of the Securities Act, in addition to aiding and abetting charges.  Accordingly, Bassily's Motion should be denied.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "A court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in the nonmovant's favor."  *CFTC v. Wilson*, 27 F. Supp. 3d 517, 531 (S.D.N.Y. 2014) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)).  The Court "may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that plaintiff knew about and relied upon."  *Id.* (citing *Chambers*, 282 F.3d at 153).  Federal Rule of Civil Procedure 9(b) requires that the

complaint "set forth the who, what, when, where and how of the alleged fraud," *Cognex Corp. v. Microscan Sys., Inc.,* 990 F. Supp. 2d 408, 418 (S.D.N.Y. 2013), and while it "demands specificity, … it does not demand that a plaintiff plead every fact that forms the alleged violations . . .." *SEC v. Collins & Aikman Corp.*, 524 F. Supp. 2d 477, 493 (S.D.N.Y. 2007).[1]

## BACKGROUND

### I.   The Fraudulent Scheme

#### A.   GTM's Business Model Was Built on Taking Hidden Charges

Khaled Bassily is the former head of the Global Transition Management unit ("GTM") of New York-based brokerage firm ConvergEx.  Compl. ¶15.  He participated in a "fraudulent scheme to conceal from brokerage customers the practice of regularly charging hidden mark-ups and mark-downs," known as "trading profits" or "TP," "on top of agreed-upon commissions on securities trades."  *Id.* ¶1-2.  These hidden charges were how Bassily and GTM made big money, raking in millions of dollars.

Here is how they made their money:  Bassily led GTM, a provider of transition management services, which executes large orders to buy and sell securities for customers changing fund managers or investment strategies.  Compl. ¶21.  Bassily worked in GTM's

---

[1] Because "a defendant cannot defeat a claim by pointing to facts that are omitted if the allegations as pled meet the requisite standard," *Collins & Aikman*, 524 F. Supp. 2d at 493, it is improper for Bassily to use a motion to dismiss to advance affirmative defenses based on facts not set forth in the Complaint, such as his anticipated "Nuremberg defense" that because senior managers "encouraged" profit-taking, he is off the hook for lying about it, Memorandum of Law in Support of Motion to Dismiss ("Def. Mem.") at 6, or his purported "advice of counsel" defense that because lawyers allegedly approved the company's business model and contracts, Bassily cannot be liable for misrepresenting that business model to customers.  Def. Mem. at 5 n.4.  While the Commission will refute these arguments with ample evidence at the proper stage, this is not it.  "Complaints need not contain *any* information about defenses, and may not be dismissed for that omission."  *Xechem Inc. v. Bristol-Myers Squibb Co.*, 372 F.3d 899, 901 (7th Cir. 2004) (emphasis in original).

3

offices in New York, New York.  *Id.* ¶15.  Under his leadership, GTM charged a disclosed

commission.  *Id.* ¶23.  Unbeknownst to customers, GTM also routed their orders to its Bermuda

affiliate, CGM Limited, whose traders schemed with Bassily and others at GTM to take as much

trading profits as they possibly could without the customer detecting the hidden charges.  *Id.*

¶¶23, 26.  In order to do so, CGM Limited acted in a principal capacity, engaging in securities

transactions for its own account.  *Id.*  ¶¶24-27.  After using other brokers to fill the order and

tacking on the hidden charges, CGM Limited delivered the order back to GTM, which confirmed

the trade to the customer only at the total price, which had the trading profits baked in and

therefore was worse than the price obtained on the market.  *Id.* ¶27.  Though customers received

information about commissions charged, they received no information that in any way disclosed

that GTM's affiliate also had taken additional hidden charges on trades.  *Id.*

       GTM typically was engaged pursuant to Transition Management Agreements, or TMAs.

Compl. ¶28.  These contracts generally indicated that GTM "may" use affiliates and that

affiliates "may" trade on a principal basis and take a "spread."  *Id.*  The contracts "gave no

indication that this was in fact done routinely," *id.*, and as Bassily concedes, the language in the

agreements "simply does not speak to the frequency or circumstances under which ConvergEx

may (or may not) choose to take spreads…."  Def. Mem. at 15-16.  These agreements also stated

that an attached "commission schedule includes all of our charges.  There are no additional

management fees for our services."  Compl. ¶28.  In addition, not all customers signed such

contracts and the contracts did not all contain the same language, but instead the contracts

"evolved over time and varied to some degree depending on the negotiations between

ConvergEx and each client."  Def. Mem. at 5; *see also* Compl. ¶28 (contracts "typically" were

signed and "generally" contained language about spreads).  Some customers negotiated different

contracts, including one that required GTM to get the customer's agreement before taking a "spread."  Compl. ¶34.

GTM generally did not take trading profits when required to act as a fiduciary, for which customers paid higher commissions.  Compl. ¶27.  These higher commissions were still far less lucrative than taking hidden trading profits, so GTM tried to dissuade customers from opting for fiduciary contracts, even falsely claiming that GTM's "behavior does not change depending on the type of contract we enter."  *Id*. ¶83.

The amounts of these hidden charges were often "several times the amount of the commission."  Compl. ¶29.  The Complaint details millions in hidden trading profits taken during the relevant five-year period alone, leading directly to Bassily receiving over $7 million in bonuses.  *Id*. ¶30.  These huge, hidden profits were taken despite the fact that CGM Limited acted as a "riskless principal," assuming "little, if any, market risk" in the trades on which such profits were taken.  *Id*. ¶¶24-25.

## B. Bassily's Fraud Was Built On Keeping His Customers in the Dark in Order to Keep the Money Coming

Bassily worked hard to cover up GTM's practices:  his role "included making and directing false statements and misleading half-truths about customers' true trade costs, coaching traders on the amount of hidden charges that could be taken without customers noticing, and encouraging the use of technological tools, false business cards, and other deceptive devices to hide the truth from customers."  Compl. ¶1.  GTM's contracts with its customers gave no hint that such conduct would occur.  *Id*. ¶28.  Bassily worked with others to create a false impression that GTM was not routing orders to an affiliate who was taking spread, a possibility alluded to in the contracts, which stated that GTM "may" do this.  *Id*. ¶¶28, 33-88.  In reality, this practice was rampant.  *Id*. ¶¶29, 31-33.

5

Bassily kept customers in the dark about GTM's affiliate taking hidden charges because he needed to do so to keep his business alive.  There is a competitive market for transition management services and, within that market, the "cost paid to execute trades" is an important issue.  Compl. ¶21.  Bassily hid the charges because he knew that "unaware" customers "would fire GTM if they learned of the truth," in part because he had seen it happen before.  *Id*. ¶31.  "He also knew that prospective customers would be less likely to do business with GTM if they knew that GTM regularly would take significant TP on their trades."  *Id*. ¶5.  Bassily employed a playbook of deceptive tricks to avoid that outcome.

1. **Step One:  Conditioning the Market With a False Impression of GTM As Conflict-Free, Agency-Only, and Transparent**

With a competitive market and cost-conscious customers, the first step in the fraud was to create the impression that commissions were the main cost of GTM's services, and that with GTM, what you saw is what you got.  So, in coordination with Bassily, GTM "advertised itself as operating on an 'agency only' basis with a transparent fee structure and no conflicts of interest," Compl. ¶3, creating a false impression belied by the frequent, conflicted routing of orders to an affiliate for principal trading and the taking of hidden profits.  Bassily helped GTM spread other misleading claims through its marketing to perpetuate this myth.  *Id*. ¶¶79-88.

2. **Step Two:  Taking Profits on Riskless Trades in Amounts That Would Keep It Concealed and Using Other Deceptive Devices to Conceal the Real Cost of Customers' Transactions**

Once customers were on the hook, Bassily used tricks to keep them in the dark about the pervasive practice of taking hidden profits on top of commissions so that they would not ask questions that might reveal the practice.  This meant taking the charges opportunistically, with Bassily monitoring each customer's cost sensitivity and keeping tabs on which ones were scrutinizing price at which moments.  Compl. ¶¶58-65.  He funneled that intelligence to traders

so that CGM Limited took "less TP, or did not take TP at all, on trades for sensitive customers," in order to maintain the false impression that the charges were not being taken as a matter of course. *Id*. ¶59.  If Bassily knew customers were paying less attention, he would have CGM Limited take more.  *Id*.  On the other hand, when Bassily knew certain customers were not closely tracking cost, he pressured traders to meet aggressive goals he set for the hidden charges. *Id*. ¶¶63-66.  For example, after instructing a trader to take $10 million in trading profits on a transition, Bassily told the trader which transition managers would scrutinize transaction details, so that the trader would "focus less on" taking profits on those trades and more on the others.  *Id*. ¶61.  The effect of this tactical calibration of trading profit amounts was to create a false impression:  that GTM did the same thing when customers were not looking as it did when they were, and that the prices paid by customers reflected prices on the market.

When circumstances threatened to expose that GTM was tacking hidden charges onto customer prices, Bassily improvised.  For instance, where a lack of market liquidity made it easier for customers to track the costs of their trades, the charges would be suspended, Compl. ¶60, and where transparency in a market made it easier for customers to track prices, Bassily approved using a randomizer algorithm so his trader could "hide," meaning the customer could not compare the prices received from GTM to the better prices the trader got on the market.  *Id*. ¶¶66-67.  When a potential new customer wanted to meet that trader, Bassily helped get fake business cards to hide the trader's offshore location and said they would "spin it" to the prospective customer with a lie.  *Id*. ¶¶74-78.

### 3.   Step Three:  Using Misleading Half-Truths, Spin, and When All Else Failed, Lying to Customers to Perpetuate the False Impression

Of course, sometimes customers did ask questions.  When that happened, the next step in the scheme was the use of misleading half-truths, evasion, and delay to maintain the false

impression that trading profits were not taken at all or that taking profits through affiliate trading was a rare, isolated occurrence.  For example, when a customer inquired about bad prices on trades in a German ETF, Bassily authorized an employee to send a detailed explanation regarding the nature of the market and ConvergEx's trading capabilities, while omitting the impact of the $53,039.04 in hidden trading profits on that one transaction.  Compl. ¶¶41-50. Similarly, when Customer A asked pointed questions about when ConvergEx acted as a principal and took spread, Bassily authorized an employee's responses dodging them.  *Id*. ¶¶35-40.

When slow playing and spin did not work and Customer A kept asking questions, Bassily resorted to an outright lie.  In the face of persistent inquiries from Customer A about the circumstances in which principal trading and spread-taking was conducted on its account, Bassily approved an employee's false response that principal trading "is rarely used in our transition business," that "no principal trading has been carried out in any transition" for that customer, and GTM "would always discuss and seek [the customer's approval]" to do so. Compl. ¶¶35-38.  This was false.  Almost $10 million in hidden trading profits had been taken on principal trades for that customer, and after this misrepresentation, another $4.5 million was taken, without GTM informing the customer or seeking its approval.  *Id*. ¶¶38-40.  Bassily was involved in multiple other false and misleading statements.  *Id.* ¶¶41-57.

On its own and taken together, the "deceptive conduct left customers with a false impression" about "the costs they paid to have their trades executed."  Compl. ¶32.  Like many frauds, this scheme was forward-looking, with Bassily and his cohorts concealing the hidden charges not just so CGM Limited could keep the charges taken on a single trade, but so that GTM could keep its customers on the hook and continue taking hidden trading profits on their entire transition, and on more transitions in the future.  The scheme's purpose thus was "to keep

the practice of regularly taking TP concealed from the customer and the market in general so that GTM could continue" the fraud.  *Id.* ¶33.  "As a result of the deception, GTM was able to continue doing business with these customers, including continuing to take TP on their trades, and GTM was able to solicit new customers and take TP on their trades."  *Id.* ¶32.

## II.    The Complaint Adequately Pleads Violations of the Relevant Securities Laws

### A.   The SEC's Fraud Allegations

Bassily argues that the Complaint's fraud claims are deficient as a matter of law because the fact that "spread" "may" be taken was disclosed to and agreed upon by customers.  This argument ignores the bulk of the fraudulent conduct alleged in the Complaint and the standards applied to allegations of fraud at the motion to dismiss stage.

The Complaint alleges violations of several antifraud provisions of the federal securities laws, including Exchange Act Section 10(b), Rule 10b-5 thereunder, Section 17(a) of the Securities Act, and secondary liability for substantially assisting others' violations of Section 10(b) and Rule 10b-5 and Exchange Act Section 15(c)(1).  To support these allegations, the Commission was required to allege facts that support very specific legal standards.  First, Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device."  15 U.S.C. § 78j(b).  Rule 10b-5 gives definition to Section 10(b) by (a) proscribing the use of "any device, scheme, or artifice to defraud," (b) making it unlawful to "make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading," and (c) prohibiting "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person."  17 C.F.R. § 240.10b-5.  In short, to state a claim for violation of Section 10(b) and Rule

10b-5, the SEC "is required to prove that in connection with the purchase or sale of a security the defendant, acting with scienter, made a material misrepresentation (or a material omission if the defendant had a duty to speak) or used a fraudulent device." *SEC v. First Jersey Sec., Inc.,* 101 F.3d 1450, 1467 (2d Cir.1996). Second, Sections 17(a)(1) and (a)(3) prohibit similar conduct, but in the "offer or sale of any securities." 15 U.S.C. § 77q(a)(1), (3). Section 17(a)(1) requires scienter, while Section 17(a)(3) does not. *Aaron v. SEC*, 446 U.S. 680, 697 (1980).

Finally, the Complaint alleges that Bassily violated Rule 10b-5(b) "through or by means of" another person, in violation of Exchange Act Section 20(b). 15 U.S.C. § 78t(b). The Complaint also alleges that Bassily aided and abetted violations of Section 10(b) and Rule 10b-5, and violations by his broker-dealer employer of Exchange Act Section 15(c)(1), which makes it unlawful for a broker or dealer "to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security . . . by means of any manipulative, deceptive, or other fraudulent device or contrivance." 15 U.S.C. § 78o(a)(1). The aiding and abetting charges are alleged pursuant to Exchange Act Section 20(e), which provides that "any person that knowingly or recklessly provides substantial assistance to another person in violation of a provision of this title" or any rule thereunder, "shall be deemed to be in violation of such provision to the same extent as the person to whom such assistance is provided." 15 U.S.C. § 78t(e).

The Complaint adequately pleads each claim. Indeed, Bassily does not challenge the Commission's pleading of the required elements of each cause of action. Def. Mem. at 18-20. Rather, he moves to dismiss only on the grounds that he believes that the language in the customers' agreements and the *Morrison* decision bars the Commission's claims against him.[2]

---

[2] It should be noted that a court in the District of New Jersey has considered and rejected a motion to dismiss that raised similar objections to a complaint by the SEC arising out of the same scheme. *See SEC v. Blumberg*, Memorandum and Order, 14-CV-4952 (KM) (D.N.J. Feb.

Bassily makes no other challenge to the sufficiency of the Commission's fraud allegations.

Thus, the only challenge to the substance of those allegations is Bassily's interpretation of

cherry-picked documents, which is insufficient for the reasons discussed in Section B below.

### B. The "Spread" Language in the Contracts is Not Fatal to the Commission's Claims

Bassily's challenge to the adequacy of the Commission's fraud allegations boils down to

this:  there were contracts in this case, so there is no fraud.  *See* Def. Mem. at 13-22.  Bassily's

argument lacks merit, however, because: (1) it fails to recognize that even "legal" conduct done

in a deceptive manner is actionable under the antifraud provisions of the federal securities laws;

(2) the GTM customer agreements do not disclose the conduct that is the basis of the fraud

alleged in the Complaint; (3) Bassily's arguments raise factual issues that cannot be resolved on

a motion to dismiss;[3] and (4) Bassily's objections to the allegations related to "prospective

customers" are contrary to the law governing SEC enforcement actions.

---

25, 2016) (attached as Ex. A to Bednar Decl.).  While unpublished and written "only for the parties," the *Blumberg* opinion found the SEC's complaint sufficient to survive the pleading stage because all the issues raised by the defendant, including whether the Commission's claims are barred by language in purported disclosures and the *Morrison* decision, "cannot profitably be addressed at the pleading stage, and must await factual development."  *Id*. at 2.

[3] Bassily attached an unsigned form customer agreement to his Motion.  *See* Ex. C to Hotz Decl.  The Commission objects to consideration of this document at this stage.  *See CFTC v. Wilson*, 27 F. Supp. 3d at 531 (The Court "may consider only the complaint, documents attached to the complaint, matters of which a court can take judicial notice, or documents that plaintiff knew about and relied upon.").  *See also Global Network Comms., Inc. v. City of New York*, 458 F.3d 150, 154-57 (2d Cir. 2006) (Court may not consider extraneous material on motion to dismiss unless plaintiff "heavily relies" upon it).  While the Commission mentions the contracts in one paragraph of the Complaint, *see* Compl. ¶28, it does not allege that all the contracts were alike, a fact Bassily concedes.  *See* Def. Mem. at 5.  Indeed, the Complaint describes an example of a customer agreement that differed markedly from the unsigned template submitted by Bassily.  Compl. ¶34.  Bassily cannot seek dismissal by asking the Court to rely on a single cherry-picked contract while simultaneously ignoring the extensive allegations of fraud in the Complaint.

11

### 1.   The Contracts Did Not Legalize Bassily's Deceptive Conduct

Bassily tries to limit his misconduct by recasting this SEC enforcement action as a breach of contract claim.  He argues that language in the customer agreements related to the possibility of "taking spread" in certain circumstances made his "acts . . . to hide" this practice lawful.  Def. Mem. at 14.  That is not the law and this argument ignores the import of the Commission's allegations of a fraudulent scheme to conceal the extent to which opportunities for trading profits were being manufactured to the detriment of customers.  As the Second Circuit has stated, even when a business practice is "legal," "doing it in a deceptive manner (like anything else in securities trading) is not."  *SEC v. Ginder*, 752 F.3d 569, 571 (2d Cir. 2014).  *See generally ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 101 (2d Cir. 2007) (while short selling is not illegal by itself, it can be "actionable as a manipulative act" when "willfully combined with something more to create a false impression of how market participants value a security."); *SEC v. Pentagon Capital Mgt. PLC*, 612 F. Supp. 2d 241 (S.D.N.Y. 2009) (while market timing is not *per se* illegal, court found allegations that market timing scheme was pursued in a deceptive manner were adequate to state a claim); *SEC v. Simpson Capital Mgt., Inc.*, 586 F. Supp. 2d 196 (S.D.N.Y. 2008) (same).  While the Commission does not concede that ConvergEx's practice of routing orders to Bermuda for the purpose of taking trading profits on top of commissions was, in fact, "legal," it has not alleged in the Complaint that Bassily violated the federal securities laws solely by taking such profits.  Rather, the fraud alleged here is based on the acts of deception that Bassily engaged in to create a false impression that additional charges were not, in fact, being taken on the customer's trades on top of commissions.

Thus, even assuming *arguendo* that taking profits on top of commissions on riskless principal trades was "legal" or authorized by contract, "doing it in a deceptive manner . . . is

not."  Deceptive conduct is exactly what has been alleged in the Complaint.  *See, e.g.,* Compl.

¶¶33-57 (misrepresentations to customers); ¶¶58-65 (using customer information to take profits

opportunistically to decrease risk of detection); ¶¶66-73 (using algorithm to hide trading activity

from customer); ¶¶74-78 (using fake business cards to hide offshore routing); ¶¶79-88 (lying to

prospective customers through marketing materials).  For this reason, Bassily's focus on whether

he had a duty to disclose trading profits to customers or whether nondisclosure of trading profits

taken on top of commissions is actionable by itself, *see* Def. Mem. at 14, is irrelevant to the

Commission's claims.  The Commission has not alleged mere nondisclosure.  Rather, the

Commission has alleged that Bassily and others engaged in repeated acts of deception to create

the false impression that a possibility alluded to in some of the customer agreements — the

prospect that GTM "may" route orders to an affiliate who "may" take a "spread" as a principal

— was not happening at all, when in fact it was rampant.  *See, e.g.,* Compl. ¶¶ 29, 31-33.

Moreover, "a contractual relationship between the parties does not wholly remove a

party's conduct from the scope of fraud."  *United States ex rel. O'Donnell v. Countrywide Home

Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016).  There can be a fraud claim where "parties were

engaged in a contractual relationship," and "the purported fraudulent statements or conduct were

made *outside* the four corners of the contract, albeit related to performance thereunder."  *Id*. at

658, 661 n.12 (emphasis in original).

Bassily cites cases like *Countrywide* to support his argument that the contracts provide

him a complete defense, Def. Mem. at 20, but those cases stand only for the commonplace

position that a fraud claim cannot be "based solely on contractual breach," where "the only

representations involved in th[e] case are contained within contracts" and there is no proof that

the defendant "made any later misrepresentations – i.e., ones not contained in the contracts – as

to which fraudulent intent could be found." *Countrywide*, 822 F.3d at 656, 658, 663.  Where a defendant is responsible for false statements and other deceptive conduct, courts have held that he cannot shield himself by claiming that the victim should "have read the contracts and ignored the false statements." *United States v. Svete*, 556 F.3d 1157, 1161, 1167 (11th Cir. 2009) (*quoting United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995)).

None of the cases cited by Bassily apply to the present circumstances.  The case against Bassily is not based on alleged representations in a contract or on the practice of taking trading profits alone, but rather on "later misrepresentations" and other fraudulent conduct "not contained in the contracts" and "as to which fraudulent intent could be found."  There are many cases finding fraud in such circumstances, and they are "perfectly consistent" with the holding in *Countrywide*.  *Id.* at 661 n.12 (*citing United States v. Naiman*, 211 F.3d 40, 49 (2d Cir. 2000) (finding fraud where contract party issued false certifications required by contracts and misrepresented included information); *United States v. Frank*, 156 F.3d 332, 334-36 (2d Cir. 1998) (finding fraud where contract party falsified billing records for contractual services); *First Bank of the Ams. v. Motor Car Funding*, 257 A.D.2d 285, 287, 289, 291-92 (N.Y. App. 1999) (finding fraud where contract party misrepresented characteristics of loans on loan tapes to mask noncompliance with representations and warranties)).  Simply put, the contracts did not permit Bassily to engage in deceptive acts to hide trading profits or permit Bassily or employees under his management to lie to customers when they asked questions about trading profits.  Thus, regardless of their content, the contracts do not support dismissal of the broad allegations of fraudulent conduct set forth in the Complaint.

## 2. The Language in the Contracts Did Not Disclose the Conduct That is the Basis of the Fraud

Bassily also argues there was no fraud because the "practice of charging mark-ups and mark-downs was not, in fact, hidden." Def. Mem. at 14. This argument fails because the fraud alleged in the Complaint is not "the practice of charging mark-ups and mark-downs," but rather deceptive acts to conceal the routine practice of taking profits on principal trades on top of, and in amounts far greater than, the commissions.

Disclosures do not foreclose liability when they "warned [customers] of a different contingency" than the fraud alleged in the Complaint. *Hunt v. Alliance N. American Gov't Income Trust, Inc.*, 159 F.3d 723, 729 (2d Cir. 1998). Here, the fraud alleged is based on affirmative acts to hide the routine practice of taking trading profits. The language in the contracts did not warn customers that GTM would conceal trading profits when taken or that it would lie about it if asked, and therefore the contracts provide no authorization for GTM to do so.

Furthermore, as Bassily himself acknowledges in a significant concession, "[t]he contractual language simply does not speak to the frequency or circumstances under which ConvergEx may (or may not) choose to take spreads . . .." Def. Mem. at 15-16. As alleged in the Complaint, all of Bassily's fraudulent conduct was aimed at covering up these very facts, which the "contractual language simply does not speak to": the frequency (routinely) and circumstances (whenever they could get away with it) under which Bassily and ConvergEx chose to take profits on riskless principal trades. Because the contracts "d[o] not speak to the frequency or circumstances under which" trading profits were taken, and are not alleged to have been independently fraudulent, the auction

rate securities cases cited by Bassily, Def. Mem. at 16-17, with their parsing of words like "may," "routinely," and "always," are of no moment here.

### 3. Bassily's Arguments Related to the Contracts Raise Factual Issues That Cannot Be Resolved on a Motion to Dismiss

For the reasons noted above, the contracts are not "fatal" to the Commission's claims, and for that reason alone, Bassily's arguments should be rejected by the Court. Moreover, even if the contracts were viewed to be relevant in some respect, Bassily's arguments regarding the meaning and import of the contract language do nothing more than raise factual questions that cannot be resolved on a motion to dismiss. First, Bassily concedes and the Complaint alleges that some customers negotiated bespoke contracts, such as the contract alleged in the Complaint that required express approval of spread-taking. Def. Mem. at 5; Compl. ¶¶28, 34. Moreover, as Exhibit C to Bassily's Motion to Dismiss makes clear, the language in certain contracts only permitted the routing of orders to affiliates in limited circumstances, namely, only "as may be required" to assist in executing the customer's order:

> The Client agrees that GTM may effect any transactions, including foreign exchange transactions, in connection with a transition through the services of its brokerage affiliates, the Bank of New York Mellon, and other entities *as may be required to execute, clear and settle the transactions*. The Client understands and directs that these entities, including GTM's affiliates, may effect these transactions on a principal basis and, in that connection, earn a spread.

*See* Ex. C to Hotz Decl. [Doc. #22] (emphasis added).

This language indicates that GTM was only permitted to route orders to affiliates on an as-needed basis, not as a routine practice, as alleged in the Complaint.

Second, Bassily does not reconcile the quoted language that he views to be helpful to his case with other statements in the customer agreements that provide that, "[t]he commission

16

schedule includes all of our charges. There are no additional management fees for our services."
Compl. ¶28.  Any attempt to reconcile this language necessarily would require consideration of
factual issues.  In sum, the "spread" language in the contracts raises more questions than it
answers for Bassily, and his arguments in this regard do nothing more than preview his factual
defenses, which it is not appropriate to evaluate on a motion to dismiss.  "The purpose of Rule
12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a
claim for relief *without* resolving a contest regarding its substantive merits."  *Global Network
Comms., Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) (emphasis in original).

### 4.  Deceptive Conduct Directed to Prospective Customers is Actionable

Bassily attempts to ignore the totality of his fraudulent scheme by arguing that the
Complaint's allegations related to the marketing materials and other deceptive conduct
directed to prospective customers fail "to draw a legally sufficient link" to "any actual
securities transactions."  Def. Mem. at 8-9, 18-20.  Notably, Bassily does not cite any
authority to support this argument, which is contrary to the law governing SEC
enforcement actions.

To state a claim for securities fraud, the SEC need not allege that anyone fell for
Bassily's falsehoods because, unlike a private litigant, the SEC is not required to show
investor reliance or damages.  *Simpson Capital Mgt., Inc.*, 586 F. Supp. 2d at 201.  Rule
10b-5 reaches not only consummated transactions, but "any act, practice, or course of
business which operates or ***would operate*** as a fraud or deceit upon any person."  17
C.F.R. § 240.10b-5 (emphasis added).  *See also* Section 17(a)(1), (a)(3) (similar).  "The
Commission may act under sections 17(a)(1) and 17(a)(3) of the Securities Act . . . and
under 10(b) . . . to enjoin a potential fraud or prosecute a fraud that failed, without proof

17

of actual loss to any victim." *Kuehnert v. Texstar Corp.*, 412 F.2d 700, 704 (5th Cir.

1969).  The SEC can hold Bassily liable even if "investors had simply failed to take the

bait," because where "fraudulent information is disseminated, but the investing public

fails to rely on that information . . .  the defendant's intent and attempt to influence is

evident." *SEC v. Adoni*, 60 F. Supp. 2d 401, 410 (D.N.J. 1999).  Rule 10b-5 prohibits not

only actions "that actually operate 'as a fraud or deceit on any person,' but also those

which 'would operate' as such," so the SEC is not "foreclosed from seeking such relief

because fortuitously the defendant's fraudulent scheme failed." *SEC v. Rana Research,*

*Inc.*, 89-CV-1865, 1990 WL 267365, *21 (C.D. Cal. Oct. 2, 1990), *aff'd* 8 F.3d 1358 (9th

Cir. 1993). *See also SEC v. Hopper*, 04-CV-1054, 2006 WL 778640, at *13 (S.D. Tex.

Mar. 24, 2006) (same as to Section 17(a)(3)).  Accordingly, Bassily's objections to the

allegations related to prospective customers fail as a matter of law.[4]

* * *

     In sum, Bassily's challenge to the adequacy of the Commission's allegations does

not survive any scrutiny of the breadth of the fraudulent scheme set forth in the

Complaint.

---

[4] The problems with this argument are highlighted by Bassily's claim that a prospective customer "would have been given the opportunity to negotiate" an agreement that "would have disclosed" certain facts. Def. Mem. at 18, 20.  Essentially he argues that it was permissible to lie because, had any prospective customer bought it, they would have had an opportunity to negotiate around it, even though the Complaint makes clear that Bassily and GTM never disclosed their common practice of taking as much TP as possible during such negotiations.  This argument is silly, purely hypothetical, and no defense to the Commission's allegations that Bassily's statements to potential customers "would operate" as a fraud.  Finally, to the extent this defense is premised on GTM's purported business practices not alleged in the Complaint, it raises a factual defense that cannot properly be assessed on a motion to dismiss.

**III.     The Supreme Court's *Morrison* Decision Does Not Bar the SEC's Claims**

In addition to the contract-based challenge set forth above, Bassily argues that the SEC's

claims are barred pursuant to the Supreme Court's decision in *Morrison*.  This argument can be

disposed of on a very simple basis:  both Bassily and his employer (a New York broker-dealer)

were located in the United States, where they received customer orders committing the

customers to purchases and sales of securities, only to have CGM Limited interposed to act as a

principal for the purpose of taking hidden profits before routing the order onward, with the

securities ultimately delivered from CGM Limited back to the customer in a domestic

transaction.  *See* Compl. ¶¶15, 23-27.  The customers' agent acted in New York, and the main

international element Bassily points to — CGM Limited's principal trading in Bermuda – was

concealed from the customers and concocted as a device to take and hide profits on top of

commissions.  *Id*.  But that device, meant to aid in fraud, had the inevitable result of causing a

domestic transaction when CGM Limited resold the securities it had purchased for its own

account back to the customer in the United States.  Thus, the novelty of Bassily's argument —

relying on the use of intermediary traders in Bermuda, which he and his cohorts used in order to

escape detection — is rivaled only by its lack of merit.

The *Morrison* analysis in this case is relatively straightforward.  The Complaint supports

the inference that this scheme involved numerous domestic transactions and transactions in

domestic securities.  Such transactions are completely different than those at issue in *Morrison v.

Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), a case involving foreign investors who purchased

the stock of a foreign company on a foreign exchange.  Based on these facts, the Supreme Court

rejected the "conduct-or-effects" analysis in use by most federal courts, and announced a two-

pronged "transactional" test to determine whether Section 10(b) of the Exchange Act, and Rule

10b-5 thereunder, apply to a transnational fraud.  The *Morrison* Court held that because nothing

indicated a Congressional intent for extraterritorial application of Section 10(b), it applies only to

frauds in connection with either (1) "transactions in securities listed on domestic exchanges" or

(2) "domestic transactions in other securities."  561 U.S. at 267.  If a complaint adequately pleads

transactions under either prong, Section 10(b) and Rule 10(b)(5) will apply.

### A.  The Complaint Alleges Domestic Transactions in Non-U.S. Securities

Here, the very structure of the scheme in which Bassily participated involves numerous

off-exchange domestic transactions (which satisfy the second prong of the *Morrison*

transactional test).  GTM had U.S. customers and was based in New York, where it received

customer orders for ConvergEx to act as an agent on customers' behalf.  Compl. ¶¶15, 21-27.

The recurring international component of the scheme — the principal trading in Bermuda —

only came into play because GTM routed orders to Bermuda for the purpose of interposing CGM

Limited as a principal so it could buy the securities (either in the U.S. marketplace or abroad)

and then resell those securities to GTM's customers at a marked-up price, thus taking trading

profits.  *Id*.  The Commission's Complaint is clear that CGM Limited acted in a principal

capacity — buying and selling for its own account  — before delivering the execution back to

New York in a domestic transaction, so that it could take hidden trading profits through resales

to GTM's customers.  *Id*. ¶¶21-27.  GTM thus caused two transactions to occur:  a foreign one in

which CGM Limited bought the security, and a domestic transaction in which that security was

resold to GTM's customer at a marked-up price.  That Bassily participated in a scheme carefully

structured with the "intention to engage in foreign transactions is entirely irrelevant," and the

Second Circuit has rejected the pleadings of defendants like Bassily who "argue that their very

intention to evade U.S. law is evidence of their innocence.  We see no reason to rescue fraudsters

when they complain that their perfect scheme to avoid getting caught has failed."[5]  *United States v. Vilar*, 729 F.3d 62, 78 n.12 (2d Cir. 2013).

At the pleading stage, to sufficiently allege an off-exchange domestic securities transaction, a complaint must set forth "facts giving rise to the plausible inference that irrevocable liability was incurred or title was transferred within the United States."  *Absolute Activist Value Master Fund, Ltd. v. Ficeto*, 677 F.3d 60, 68, 69 (2d Cir. 2012).  This is a "fact specific" inquiry, *Butler v. United States*, 992 F. Supp. 2d 165, 176 (E.D.N.Y. 2014), and relevant facts include, but are not limited to, "facts concerning the formation of the contracts, the placement of purchase orders, the passing of title, or the exchange of money…."  *Absolute Activist*, 677 F.3d at 70.

In the present case, the Complaint sets forth sufficient facts to support the inference that domestic transactions were involved in the scheme because irrevocable liability was incurred domestically.  At bottom, "territoriality under *Morrison* concerns where, physically, the purchaser or seller committed him or herself."  *Vilar*, 729 F.3d at 77 n.11.  *See also SEC v. Amerindo Inv. Advisors, Inc.*, 05-CV-5231 (RJS), 2014 WL 405339, at *4-8 (S.D.N.Y. Feb. 3, 2014) (applying principles of *Vilar* to find domestic transactions in non-U.S. securities in SEC

---

[5] It is this two-transaction structure, employed to engage in fraud, that distinguishes the facts of this case from those addressed by the Second Circuit in *City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173, 181-82 (2d Cir. 2014).  In *City of Pontiac*, the Second Circuit found that the "mere placement" of a buy order in the United States to purchase foreign securities on a foreign exchange was not sufficient to bring the case within the ambit of Section 10(b).  In this case, by contrast, Bassily and his cohorts interposed CGM Limited, which purchased foreign securities on foreign exchanges for itself, and then resold them at a mark-up to GTM's customers in off-exchange domestic transactions.  *City of Pontiac* thus does not preclude the Commission's Section 10(b) claims.  In any event, as discussed below in Section III.C., the Congressional focus in Section 17(a) and Section 15(c) is much broader (reaching domestic conduct in the offer or sale of any securities, and reaching a broker or dealer's domestic conduct in inducing, attempting to induce, or effectuating a transaction), and for this additional reason *City of Pontiac*'s application of *Morrison*'s Section 10(b) transactional test would not apply to the Commission's claims under Section 17(a) and Section 15(c).

case).  Here, GTM was based in New York, had U.S. customers, received customer orders at the

New York offices of ConvergEx before routing them offshore, and received the orders back at

GTM after the TP was tacked on.  Compl. ¶¶15, 21-27.  Facts such as these are more than

enough to support the reasonable inference that irrevocable liability was incurred in the United

States.  *See Vilar*, 729 F.3d at 77-78.  *See also Butler*, 992 F. Supp. 2d at 178 (*Morrison* satisfied

in part through purchases and sales of securities by New York-based defendant, "as American

based agent of the client").

Many cases have found the requirements of *Morrison* are satisfied on the basis of similar

facts.  *See, e.g., United States v. Mandell*, 752 F.3d 544, 549 (2d Cir. 2014) (sustaining criminal

conviction where investors in two of three private placements involved in scheme "were required

to submit purchase applications and payments to the company in the United States," because

"[u]nder *Vilar*, these were 'domestic transactions.''); *United States v. Isaacson*, 752 F.3d 1291,

1299 (11th Cir. 2014) (upholding conviction because, assuming *Morrison* applied in a criminal

case, it was satisfied by "evidence that the Lancer Fund was run out of New York City and that

Mr. Isaacson's office was located in Florida, which supports the inference that the Lancer Fund

purchased the securities in the United States.") (internal quotation marks omitted); *SEC v.

Levine*, 462 Fed. Appx. 717, 719 (9th Cir. 2011) (Securities Act applies where "actual sales

closed in Nevada when [Levine] received completed stock purchase agreements and

payments."); *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp.

3d 550, 560 (S.D.N.Y. 2014) (finding domestic transactions supported by allegations that

plaintiffs placed orders with agent in U.S. who transmitted orders to U.S. broker-dealer, and

plaintiffs' funds were transferred to agent's back office in U.S.); *Butler*, 992 F. Supp. 2d at 178

(sustaining conviction because "transactions at issue were primarily domestic," based on

evidence such as account opening documents, securities accounts, and purchases and sales of securities by New York-based defendant, "as American based agent of the client"). These facts also support the reasonable inference that title was passed in the United States. *See Quail Cruises Ship Mgt. Ltd. v. Agencia de Viagens*, 645 F.3d 1307, 1310-11 (11th Cir. 2011) (reversing district court because allegations that closing in Florida precipitated transfer of title was sufficient to satisfy *Morrison* at the motion to dismiss stage).

Further, the Complaint alleges that the scheme involved routing certain orders offshore so that hidden trading profits could be taken, "only to have those trades routed to a U.S. broker for execution." Compl. ¶¶23, 29. In *United States v. Georgiou*, the Third Circuit upheld a criminal conviction and rejected a *Morrison* argument where "at least one of the fraudulent transactions" "was bought and sold through U.S.-based market makers." 777 F.3d 125, 136 (3d Cir. 2015).

## B. The Complaint Alleges Transactions in Domestic Securities

The Complaint also satisfies *Morrison*'s first prong by alleging that the scheme at issue involved transactions in securities listed on a domestic exchange. Bassily's scheme involved taking hidden profits on many transactions in domestic securities, as transition management orders "often included securities listed on U.S. exchanges." Compl. ¶23. For instance, during the period covered in the Complaint, GTM and CGM Limited worked together to take about $543,000 in hidden trading profits on a university's securities transactions and another $283,000 on a charity's transactions, and both transactions "involved trades in only U.S. equities." *Id*. ¶29. Likewise, after Customer A was misled at the direction of Bassily, it continued providing transition business to GTM, which worked with CGM Limited to take about $4.5 million in additional concealed charges, "of which approximately $1.7 million was taken on securities listed on U.S. exchanges." *Id*. ¶40. Similarly, Bassily approved misleading Customer C to cover

up trading profits taken on top of commissions on trades in a German security, so that Customer C would keep doing business with GTM. It worked, and another $3.5 million in hidden profits were taken on top of commissions on trades for Customer C induced by the fraud, "of which approximately $600,000 was taken on trades in securities listed on U.S. exchanges." *Id*. ¶¶50-57. These allegations satisfy the first prong of *Morrison*, and thus preclude dismissal even if this Court finds that the transactions in non-U.S. securities were not domestic (which they were).

As a result, Bassily is left with the flawed argument that dismissal is warranted because the Complaint does not identify every stock at issue, and that anything less specific is "conclusory." But this argument has no basis in law. A plaintiff does not need to "plead fraud with the detail of a desk calendar or a street map," *Gelles v. TDA Indus., Inc.*, 90-CV-5133 (MBM), 1991 WL 39673, at *6 (S.D.N.Y. Mar. 18, 1991), and nothing in *Morrison* requires identification of every security or transaction involved in a fraudulent scheme at the pleading stage. Such a hyper-particularity requirement would make little sense here, where the Complaint alleges a pattern of deception spanning more than five years and forming the basis for GTM's entire business model. It was appropriate for the Complaint to include a detailed description of GTM's business model and the structure of the transactions at issue, rather than specifically identify thousands of trades over a five-year period in which GTM and CGM Limited took hidden trading profits.[6]

### C. *Morrison* Does Not Bar the SEC's Claims for Violating Securities Act Section 17(a) and Aiding and Abetting Violations of Exchange Act Section 15(c)(1)

Bassily's *Morrison* arguments are meritless for the reasons discussed above. However, they do not even apply to Bassily's violations of Section 17(a) or the violations of Section

---

[6] Indeed, the *Blumberg* court sustained the SEC's complaint against a similar challenge, noting that the SEC is "not required" to "list each transaction individually." *Blumberg* at 3.

15(c)(1) of the Exchange Act by his employer that Bassily aided and abetted.  "Section 17(a), unlike Section 10(b), applies not only to the 'sale' but also to the 'offer' . . . of securities," and so a Section 17(a) claim has been held to satisfy *Morrison* by alleging a domestic offer, even in the absence of a consummated transaction.  *SEC v. Goldman Sachs & Co*., 790 F. Supp. 2d 147, 164-65 (S.D.N.Y. 2011).  *See also SEC v. Tourre*, 10-CV-3229 (KBF), 2013 WL 2407172 at *7 (S.D.N.Y. June 4, 2013) ("The Court . . . holds that, for claims of fraud 'in the offer' of securities, Section 17(a), in conjunction with *Morrison* and *Absolute Activist,* requires that the relevant offer of securities be made in the United States.").  As the court in *Tourre* explained, "[u]nlike Section 10(b) . . . Section 17(a) is not exclusively concerned with fraudulent conduct in connection with a transaction in securities, but rather is concerned with such conduct in either the offer or the sale of securities," such that "the requirement of domestic conduct under Section 17(a) must be extended accordingly."  2013 WL 2407172, at *7.

Judge Forrest's ruling in *Tourre* is consistent with the position of the Ninth Circuit, which has held that, "[e]ven assuming *Morrison*'s holding applies" to Section 17(a), *Morrison* was satisfied where the defendants "made numerous domestic offers of securities by soliciting potential investors in the United States."  *United States v. Sumeru*, 449 Fed. Appx. 617, 621 (9th Cir. 2011).  As detailed above, the allegations in the Complaint support the inference that an offer or sale of securities took place in the United States.  *See, e.g.,* Compl. ¶¶15, 21-27.

With respect to the application of the principles in *Morrison* to Exchange Act Section 15(c), this Court should employ a similar analysis because Section 15(c) of the Exchange Act is not limited to the purchase or sale of securities but extends to fraudulent conduct used "to effect any transaction" or that "induce[s]" or "attempt[s] to induce the purchase or sale" of securities. 15 U.S.C. §78o(c)(1)(A).  Accordingly, the domestic conduct sufficient to support a claim under

*Morrison* for aiding and abetting violations of Section 15(c) should include conduct in the United States aiding or abetting the effecting, inducing, or attempting to induce, the purchase or sale of securities.  The Complaint clearly alleges such conduct throughout, in spades.  *See, e.g.,* Compl. ¶¶15, 23 (Bassily, while based in New York and acting as customer's agent, effected securities transactions by routing them offshore so CGM Limited could engage in principal trading before routing orders back); ¶¶15, 77-88 (Bassily, while based in New York, sent fraudulent marketing materials in attempt to induce prospective customers to engage in securities transactions with ConvergEx).  The limited authority cited by Bassily in support of applying *Morrison*'s transactional analysis to Section 17(a) and Section 15(c) did not employ the kind of careful textual analysis displayed in *Tourre, Goldman Sachs*, and *Sumeru*.  Thus, regardless of its merit (or lack thereof), Bassily's *Morrison* argument should not apply to the Commission's allegations that he violated Section 17(a) and aided and abetted violations of Section 15(c).

### D.  The Conduct-or-Effects Test Applies to Bassily's Post-Dodd-Frank Conduct

Regardless of how the Court applies *Morrison* to Bassily's earlier misconduct, it should apply the conduct-or-effects test to conduct occurring on or after July 22, 2010, the effective date of the Dodd-Frank Act.  The Complaint easily satisfies the conduct-or-effects test for all the reasons cited above, and because nearly all of Bassily's fraudulent conduct occurred in the United States, while he was working in GTM's New York office.  Compl. ¶15.   Bassily does not dispute that the Complaint satisfies the conduct-or-effects test for his post-Dodd-Frank conduct, arguing instead that Dodd-Frank did not overrule *Morrison*, and if it did, it should not apply retroactively.  Def. Mem. at 23-26.  The Commission does not seek to apply the conduct-or-effects test to Bassily's pre-Dodd-Frank conduct, so there is no dispute with respect to retroactivity.  Moreover, because the Complaint satisfies *Morrison*, the Court need not resolve

this issue.  Nevertheless, should the Court determine that it needs to assess whether Dodd-Frank overruled *Morrison* for conduct that occurred on or after July 22, 2010, the Commission offers the following points and authorities.

Section 929P(b)(2) of Dodd-Frank amended Section 27 of the Exchange Act and Section 22 of the Securities Act to provide federal courts with jurisdiction to hear SEC and DOJ claims concerning violations of the antifraud provisions of the securities laws where they involve "(1) conduct within the United States that constitutes significant steps in furtherance of the violation, even if the violation is committed by a foreign advisor and involves only foreign investors; or (2) conduct occurring outside the United States that has a foreseeable substantial effect within the United States."  15 U.S.C. §78aa(b); 15 U.S.C. § 77v(c).  In this regard, it has been observed, but not held, that Dodd-Frank "effectively reversed *Morrison* in the context of SEC enforcement actions" and reinstated the conduct–or–effects test for post-Dodd-Frank conduct.  *Tourre*, 2013 WL 2407172, at *1 n.4.[7]

Bassily contends that Section 929P(b) is merely a redundant grant of the already broad subject-matter jurisdiction of the Exchange Act.  *See* 15 U.S.C. 77v(a), 78aa(a), 80b-14(a).  This would render it a superfluous and pointless nullity, violating "a cardinal principle of statutory

---

[7] Several judges in this district have agreed, though none has had occasion to issue a dispositive holding.  *See, e.g., In re Optimal U.S. Litig.*, 865 F. Supp. 2d 451, 456 n.28 (S.D.N.Y. 2012)  (Dodd-Frank "restor[ed] the conducts [*sic*] and effects test for SEC enforcement actions"); *Liu v. Siemens A.G.*, 13-CV-317 (WHP), 2013 WL 5692504, at *3 (S.D.N.Y. Oct. 21, 2013) ("Section 929P(b) permits the SEC to bring enforcement actions for certain conduct or transactions outside the United States."); *SEC v. Gruss*, 11-CV-2420 (2012 WL 3306166, at *3 (S.D.N.Y. Aug. 13, 2012) ("Section 929P(b) . . . allows the SEC to commence civil actions extraterritorially in certain cases."); *SEC v. Compania Internacional Financiera SA*, 11-CV-4904, 2011 WL 3251813, at *6 n.2 (S.D.N.Y. July 29, 2011) ("It may be that [929P(b)] was specifically designed to reinstate the Second Circuit's 'conduct and effects' test."); *Cornwell v. Credit Suisse Group*, 729 F. Supp. 2d 620, 627 n.3 (S.D.N.Y. 2010) ("[I]n legislation recently enacted, Congress explicitly granted federal courts extraterritorial jurisdiction under the conduct or effect test for proceeding brought by the SEC.").

construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001).

Congress has the power to make a statutory requirement jurisdictional, and if Congress "clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue." *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515-16 (2006). Congress can readily shift a merits-related statutory requirement to a jurisdictional requirement by amending the statute to move the requirement into the statute's subject-matter jurisdiction provision. *Id*. at 514-15 ("Of course, Congress could make the [statutory] requirement 'jurisdictional,' just as it has made an amount-in-controversy threshold an ingredient of subject-matter jurisdiction….").

*Morrison* noted that, in assessing Congressional intent to apply a statute extraterritorially, "context can be consulted" and "a clear statement" is not required. 561 U.S. at 265. The context of Section 929P(b) leaves little doubt as to its meaning, including the heading under which the section appears: "STRENGTHENING ENFORCEMENT BY THE COMMISSION." *See INS v. Nat'l Ctr. For Immigrants' Rights, Inc.*, 502 U.S. 183, 189 (1991) ("the title of a . . . section can aid in resolving an ambiguity"). Further, related amendments to the Securities Act and Investment Advisers Act of 1940, which also expressly adopted the conduct-or-effects test as a requirement of subject-matter jurisdiction, refer to those statutes' specific antifraud provisions.

Section 929P(b)'s history provides further guidance. Originally introduced while the *Morrison certiorari* petitions were pending, the provision responded to the Second Circuit's invitation that "appropriate attention in Congress" be given to the "omission" of any discussion in the antifraud provisions of "transactions taking place outside the United States." *Morrison v.*

28

*Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 & n.4 (2d Cir. 2008) (quotation omitted). *See* Investor Protection Act of 2009, H.R. 3817 (111th Cong., 2d Sess.), at § 216.  The proposal sought to expressly incorporate the conduct-or-effects test as a requirement of subject-matter jurisdiction. *See* Committee Report on the Investor Protection Act of 1009, H.R. Rep. 111-687, pt. 1, at 80 (Dec. 16, 2010).

As it happened, this proposal was incorporated into the Conference Committee report on what became the Dodd-Frank Act on the same day the Supreme Court issued its decision in *Morrison*.  What began as a codification of the law as it then existed in the lower courts became effectively a response to the Supreme Court's decision, overriding the decision as to SEC and DOJ enforcement actions involving transnational securities frauds that occur after the Act became law.  The proposal's sponsors recognized this changed context during legislative debates on Dodd-Frank. *See* 156 Cong. Rec. H5237 (daily ed. Jun. 30, 2010) (Rep. Kanjorski explained on House floor that *Morrison* "appl[ied] a presumption against extraterritoriality" and 929P(b) "rebut[s] that presumption by clearly indicating that Congress intends extraterritorial application in cases brought by the SEC" "irrespective of whether the securities are traded on a domestic exchange or the transactions occur in the United States . . . ."); *and* 156 Cong. Rec. 105, S5915-16 (July 15, 2010) (Sen. Jack Reed explaining that amendment "clarifies that in actions brought by the SEC," antifraud provisions "apply if the conduct within the United States is significant, or the external U.S. conduct has a foreseeable substantial effect within our country, whether or not the securities are traded on a domestic exchange or the transactions occur in the United States.").

No authority requires the Court to ignore this context and violate "a cardinal principle of statutory construction" by rendering Section 929P(b) a nullity.  Bassily points to brief Second Circuit dicta that, while Congress amended the securities acts "[i]n response to *Morrison*," "the

import of this amendment is unclear" because the amendment's jurisdictional language contrasts with *Morrison*'s treatment of extraterritoriality as a merits issue.  Def. Mem. at 24 (*citing Parkcentral Global Hub Ltd. v. Porsche Auto. Holdings SE*, 763 F.3d 198, 211 n.11 (2d Cir. 2014) (*per curiam*)).  *Parkcentral* did not analyze the issue or cite *Arbaugh*, which resolves the perceived merits-versus-jurisdiction tension.  In only one of the other cases Bassily cites did the court analyze the issue in any depth, and that court, which did not apply *Arbaugh*, appears to have mistakenly believed that effectuating the Congressional intent "to override *Morrison*'s transactional test" would require it to construe Section 929P(b) as substantive rather than jurisdictional.  *SEC v. A Chicago Convention Center, LLC*, 961 F. Supp. 2d 905, 911-17 (N.D. Ill. 2013).  In any event, that court did not resolve the issue because, as in this case, the complaint satisfied both the transactional and conduct-or-effects tests.

*  *  *

As established above, *Morrison* presents no bar to the SEC's claims.  The Supreme Court's decision in *Morrison* envisioned the securities laws covering the exact types of transactions at issue here:  domestic transactions involving, in many instances, securities listed on domestic exchanges.  Moreover, *Morrison* does not apply to Bassily's violations of Section 17(a) or the violations of Section 15(c) that he aided and abetted, nor does *Morrison* apply to his post-Dodd-Frank conduct, which clearly falls within the ambit of the securities laws as articulated in Dodd-Frank.

## CONCLUSION

For the reasons set forth above, Bassily's Motion to Dismiss should be denied.

Dated:          August 2, 2016

Respectfully submitted,

s/ Tom Bednar
Thomas A. Bednar
SECURITIES AND EXCHANGE
COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985
(202) 551-6218

CERTIFICATE OF SERVICE

I certify that on August 2, 2016, a copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system.

_____/s/ Tom Bednar_____
Thomas A. Bednar
Counsel for Plaintiff, Securities and Exchange Commission

31