## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES SECURITIES AND EXCHANGE COMMISSION,<br><br>         **Plaintiff,**<br><br>**v.**<br><br>KHALED "KAL" BASSILY,<br><br>         **Defendant.** | **AMENDED COMPLAINT**<br><br><br>**Civil Action No. 16-CV-2733 (RJS)**<br>**ECF CASE**<br>**(Jury Trial Demanded)** |

Plaintiff, the United States Securities and Exchange Commission (the "Commission"), alleges for its Amended Complaint as follows against Khaled "Kal" Bassily:

### SUMMARY OF ALLEGATIONS

1.  This is a securities fraud enforcement action arising out of a fraudulent scheme to conceal from brokerage customers the practice of regularly charging hidden mark-ups and mark-downs on top of agreed-upon commissions on securities trades placed with a New York-based brokerage firm.  For years, Defendant Bassily, the head of the firm's transition management group, engaged in a pattern of deceptive conduct, and repeatedly directed and encouraged other employees to engage in deceptive conduct, all aimed at creating a false impression about the customers' true costs of executing securities trades.  Bassily's participation in this scheme included making and directing false statements and misleading half-truths about customers' true trade costs, coaching traders on the amount of hidden charges that could be taken without customers noticing, and encouraging the use of technological tools, false business cards, and other deceptive devices to hide the truth from customers.  The scheme resulted in millions of

1

dollars in hidden charges, dwarfing the commissions that customers had negotiated and paid, and directly enriched Bassily, who received millions of dollars in bonuses.

2.      The hidden charges at issue were referred to in the scheme as "trading profits," or more commonly, as "TP," and were in addition to the disclosed commissions paid by customers.

3.      Bassily headed the Global Transition Management group ("GTM") of ConvergEx Execution Solutions LLC.

4.      GTM advertised itself as operating on an "agency only" basis with a transparent fee structure and no conflicts of interest.  An agency broker acts as a middle man between its customer and the market, taking customer orders and finding existing, corresponding orders in the market for execution.  An agency broker is thus different from a broker-dealer acting in a principal capacity, where the broker-dealer may buy from or sell to its customer from its own account.  Agency brokers are typically compensated through commissions.

5.      Despite advertising itself as an "agency only" broker with transparent fees and no conflicts, GTM routinely routed transition management orders, including orders to buy and sell securities listed on U.S. exchanges, to its offshore affiliate, which traded not as a commission-based agent but on a riskless principal basis while taking mark-ups and mark-downs on riskless trades.  The hidden TP taken by the offshore affiliate was in addition to, and often far more than, the disclosed commission that the customer agreed to pay GTM.  GTM received credit for TP within the ConvergEx group, and GTM's profitability as a ConvergEx business line largely depended on the hidden TP taken on trades for its customers.

6.      Bassily knew that customers likely were unaware that they paid TP in addition to the agreed-upon commission and would fire GTM if they learned the truth.  He also knew that

prospective customers would be less likely to do business with GTM if they knew that GTM regularly would take significant TP on their trades.

7. Accordingly, during the relevant period of October 2006 until December 2011, Bassily knowingly or recklessly participated in a fraudulent scheme by engaging in, and directing and encouraging others to engage in, repeated deceptive acts designed to hide the practice of taking TP and maximize the amount of TP that could be taken without detection by transition management customers. By engaging in the transactions, practices, or courses of business set forth herein, Bassily also failed to conform his conduct to a standard of reasonable care.

8. Specifically, Bassily drafted, approved and, through his subordinates, made material misrepresentations to customers and prospective customers that created a false impression regarding the true costs of executing transition management orders through GTM.

9. Bassily also regularly communicated with ConvergEx traders at GTM's offshore affiliate to share customer information in order to maximize TP, while minimizing the risk that the customer would detect the hidden charges. Bassily often set TP goals for trades and pressured ConvergEx traders to meet those goals. Bassily even authorized traders to take TP in an amount that would result in the customer unnecessarily buying at the market high of the day and selling at the market low of the day.

10. Moreover, Bassily approved of and encouraged the use of a technological tool to trade in a transparent foreign market without exposing the taking of TP and helped to procure false business cards for a trader to use when soliciting business from a prospective customer to avoid questions that ultimately could reveal the practice of taking TP.

11.     As a result of the scheme that Bassily participated in and supervised, approximately $130 million in hidden TP was taken on tens of thousands of trades for approximately 150 GTM customers.

12.     By engaging in the misconduct described herein, Bassily directly or indirectly violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and alternatively, violated Section 10(b) and Rule 10b-5(b) through or by means of any other person, pursuant to Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)]; aided and abetted violations of Sections 15(c)(1) and 10(b) of the Exchange Act and Rule 10b-5 thereunder, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]; and violated Sections 17(a)(1) and 17(a)(3) of the Securities Act of 1933 (the "Securities Act") [15 U.S.C. § 77q(a)].

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to Sections 20(b) and (d) and 22(a) of the Securities Act [15 U.S.C. § 77t(b) and (d); 15 U.S.C. § 77v(a)] and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa] and 28 U.S.C. § 1331.

14.     Venue is proper in this Court pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts or transactions constituting the violations of law alleged herein occurred within this judicial District and Bassily can be found, is an inhabitant of, or transacts business in this judicial District.

15.     Bassily, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or the facilities of a national securities exchange in connection with the transactions, acts, practices, and courses of business alleged herein.

## DEFENDANT

16.     Defendant Khaled "Kal" Bassily is 51 years old and resides in New York, New York.

17.     At all times relevant to this Complaint, Bassily was the head of the Global Transition Management business unit of ConvergEx Execution Solutions LLC ("CES"), and also a managing director of CES.  Bassily was fired from CES in 2013.  At all times relevant to this Complaint, Bassily worked in GTM's offices in New York, New York.

18.     From 1998 through 2013, Bassily was associated with broker-dealers registered with the Commission.  During the relevant period of October 2006 until December 2011, Bassily was a registered representative associated with CES and held various securities industry licenses, including a Series 7 (General Securities Representative) and Series 24 (General Securities Principal).

19.     Bassily has a Master of Business Administration ("MBA") degree from Columbia University and is a Chartered Financial Analyst.

## RELEVANT ENTITIES AND INDIVIDUALS

20.     At all times relevant to this Complaint, **ConvergEx Execution Solutions LLC ("CES")** has been a registered broker-dealer and a wholly-owned subsidiary of ConvergEx Group, LLC ("ConvergEx"), a global investment services and technology firm headquartered in New York, New York.  CES also is headquartered in New York, New York.  CES has been registered with the Commission as a broker-dealer since January 1994, and was registered as an investment adviser throughout the relevant period.  During the relevant period, CES offered global transition management services, as well as other order execution services.  CES has been a member of the New York Stock Exchange since January 1994.  In December 2013, CES settled

the Commission's claims against it for its role in the scheme described in this Complaint in an administrative proceeding.  *See* SEC Rel. No. 34-71128 (Dec. 18, 2013).

21.     **ConvergEx Global Markets Limited ("CGM Limited")** was a Bermuda broker-dealer and a wholly-owned subsidiary of ConvergEx.  CGM Limited was regulated by the Bermuda Monetary Authority until 2012 when it voluntarily relinquished its securities license. In January 2012, it ceased executing trades in equities.  In December 2013, CGM Limited settled the Commission's claims against it for its role in the scheme described in this Complaint in an administrative proceeding, *see* SEC Rel. No. 34-71128 (Dec. 18, 2013), and entered a guilty plea in the United States District Court for the District of New Jersey to one count of conspiracy to commit wire and securities fraud and one count of wire fraud in a parallel criminal proceeding instituted by the United States Department of Justice.

22.     **Jonathan Daspin** was the global head of trading of CGM Limited in Bermuda during the relevant period, until his discharge in 2011.  In December 2013, Daspin settled the Commission's claims against him for his role in the scheme described in this Complaint in an administrative proceeding, *see* SEC Rel. 34-71126 (Dec. 18, 2013), and entered a guilty plea in the United States District Court for the District of New Jersey to one count of conspiracy to commit wire and securities fraud in a parallel criminal proceeding instituted by the United States Department of Justice.

## THE GTM BUSINESS MODEL

### *The Transition Management Business*

23.     During the relevant period of October 2006 through December 2011, Defendant Bassily was in charge of GTM, a former, unincorporated business division of registered broker-dealer CES.  Bassily worked in GTM's offices in New York, New York.

24.     GTM offered global transition management services.  Transition management services typically are marketed by financial institutions to pension funds, investment managers, and other organizations that are changing fund managers or investment strategies.  Customers seek out transition management services in order to minimize risks and preserve the value of their portfolios while in transition, as transitions often involve the execution of a large quantity of orders to buy and sell securities, introducing a number of risks and costs for the customer.

25.     Because the primary reason customers seek transition management services is to reduce the risks and costs associated with a transition, the fees and commissions charged for those services were material to GTM's customers.  Many of GTM's customers shopped around to compare transition management services providers, including comparing the costs associated with executing their securities transactions.

26.     Indeed, GTM often competed for transition management business by participating in a request for proposal process, in which GTM and other transition management service providers submitted packages that included bids and information about their services.  In this process, the costs of using a particular transition management service provider were highly material to prospective customers.

27.     During the relevant time period, the market for transition management services included a relatively small number of major service providers, including GTM, who frequently competed against each other for the same business.  In addition, many transition management customers worked with professional transition consultants, who assisted in the selection of transition management service providers, and who oversaw their work once hired.

28.     Given the nature of this market, if negative information about a transition management service provider became known to a customer or consultant, it quickly could spread

throughout the market and impair that provider's ability to win future business. This is why it was imperative for Bassily and GTM to ensure that every customer and consultant, including every prospective customer and consultant, was kept in the dark about the true nature of GTM's business practices. By preventing the truth about their fraudulent scheme from entering the market, Bassily and GTM were able to perpetuate the scheme, obtaining more business from existing customers and attracting new customers.

***GTM's Contractual Relationships with Customers***

29.     GTM typically provided its services to customers pursuant to a Transition Management Agreement, or TMA. The TMA outlined the services to be provided and the rights and obligations by which each party would be bound while conducting securities transactions.

30.     Some customers negotiated their own TMAs with custom contractual terms, including terms governing GTM's compensation. For the most part, however, GTM sent customers a standard TMA form, usually on GTM's New York letterhead, that had been drafted by GTM. For almost all of the 150 customers victimized by the scheme, the TMA stated that they were contracting with GTM, a division of New York brokerage CES. In a few circumstances, customers entered into TMAs with the London office of GTM and CES.

31.     The Transition Management Agreements signed by GTM's customers generally included boilerplate language to the effect that GTM "may" effect transactions through affiliates "as may be required to execute, clear and settle the transactions," and that these affiliates "may effect these transactions on a principal basis and, in that connection, earn a spread." The transition management agreements gave no indication that this was in fact done routinely, including on orders involving securities listed on U.S. exchanges.

32.     These transition management agreements also included an "Exhibit A" disclosing the "commissions and other fees" that the customer would agree to pay GTM.  Exhibit A listed the commission rates, but did not include mark-ups or mark-downs to be taken on trades in addition to commissions.  To the contrary, Exhibit A typically stated that "[t]he commission schedule includes all of our charges.  There are no additional management fees for our services."

33.     When a customer requested "fiduciary" treatment, CGM Limited generally did not take TP on the customer's trades, but GTM usually charged a higher commission.

**The Structure of GTM's Scheme**

34.     GTM acted as an agent on behalf of customers and charged a disclosed commission, usually stated on a cents-per-share basis or in terms of basis points (one basis point is a hundredth of a percent, such that 100 basis points equals 1 percent).

35.     Customer orders were entered into an order management system, which allowed GTM to have orders routed offshore to its affiliate, CGM Limited.  These customer orders often included orders to trade securities issued by U.S.-domiciled companies that were listed on exchanges in the United States.  Most of these orders were received in the New York office of CES, which was ConvergEx's U.S. trading arm and a member of U.S. exchanges.  Instead of allowing the CES traders in New York to execute the orders, Bassily and others at GTM, including those under Bassily's supervision, unnecessarily had the orders routed to CGM Limited in Bermuda in order to take hidden TP on the trades, only to have those U.S. orders routed back to a third-party U.S. broker for execution.  Available ConvergEx business records indicate that almost all of the orders to buy or sell securities listed on U.S. exchanges ultimately were executed and settled in the United States.

36.     To take TP on a customer order, CGM Limited acted in a riskless principal capacity.  In general, a "riskless principal" trade occurs when a broker-dealer, after receiving a customer order to buy (or sell) a security, buys (or sells) the security for its own account from (or to) another party in a contemporaneous offsetting transaction and then allocates the shares to the customer order.

37.     CGM Limited was not a market maker, and generally did not commit its own capital to facilitate customer executions or offer customers guaranteed prices.  CGM Limited thus assumed little, if any, market risk when handling and executing customer orders.

38.     With a GTM customer order in hand, CGM Limited bought or sold the securities listed in the customer's order for CGM Limited's own account through a local broker in the relevant market.  Bassily and others at GTM then advised CGM Limited's traders whether, and to what extent, they could add a mark-up or mark-down to the price received from the local broker without detection by the customer.

39.      After buying and selling the securities for its own account, CGM Limited marked up or marked down the price received from the local broker and then delivered the order it had executed for itself to GTM via CES, to be bought from or sold to the customer at the marked-up or marked-down price.  GTM then confirmed the trade to the customer only at the marked-up or marked-down price, which embedded the undisclosed TP amount.

40.     As a result, when CGM Limited took TP on a customer's trade, the price reported to the customer by GTM was worse than the price that CGM Limited had received from the local broker.  Customers on whose orders TP had been taken received information that included the amount of commission charged, but were not informed that any mark-ups, mark-downs, or other compensation also had been taken.

41.     As a U.S.-registered broker-dealer, CES would have been required to make disclosures that would have revealed the hidden charges if they had been taken by CES.  Only by placing CGM Limited in the middle of the executions and taking the hidden charges through an offshore entity, unbeknownst to its customers, could GTM and CES obtain TP for the ConvergEx group.

*TP Amounts Often Far Exceeded Commissions*

42.     The amount of TP taken on trades for customers often far exceeded the agreed-upon commission.  It was not uncommon for the amount of TP to be several times the amount of the commission that the customer had paid GTM.

43.     For example, during the relevant period, GTM conducted securities transactions for a U.S.-domiciled university, which paid GTM approximately $93,000 in disclosed commissions, but also paid approximately $543,000 in undisclosed TP.

44.     The university's TMA was on GTM's New York letterhead and bears the university's U.S. address and was executed by a U.S.-based employee of the university, indicating that the university executed the TMA, and thus incurred irrevocable liability, in the United States.

45.     The TMA was faxed from the university to GTM in New York, where a GTM employee signed it for GTM, thus causing GTM to incur irrevocable liability for the transactions in the United States.

46.     Similarly, during the relevant period, GTM conducted securities transactions on behalf of a U.S.-domiciled religious and charitable organization, which paid approximately $33,000 in disclosed commissions, but also paid approximately $283,000 in undisclosed TP.

47.     The charitable organization's TMA was on GTM's New York letterhead and bears the charitable organization's U.S. address, and was signed by a U.S.-based employee of the charity, indicating that the charity executed the TMA, and thus incurred irrevocable liability, in the United States.

48.     The TMA was then returned to GTM in New York, in accordance with the instructions in the TMA, and was signed by a New York-based GTM employee, thus causing GTM to incur irrevocable liability for the transactions in the United States.

49.     In both cases, the transactions only involved trades in U.S. securities, yet GTM unnecessarily routed the customers' orders offshore to CGM Limited in order to take TP, even though CGM Limited had to route the orders back to third-party U.S. brokers for execution.

50.     All of the trades involved in the orders for these two customers were executed and settled in the United States, meaning that title to the securities passed in the United States.

51.     GTM received credit within ConvergEx for the TP taken by CGM Limited on GTM customer trades.  TP was important to GTM's profitability as a business unit, which in turn was a significant factor in making employee compensation determinations, including Bassily's annual bonus amounts, which were several times his base salary and totaled over $7 million during the relevant period.

***The Scheme Involved Tens of Thousands of Domestic Transactions***

52.     The fraudulent scheme in which Bassily participated involved tens of thousands of domestic transactions, as a result of one or both parties to the TMAs incurring irrevocable liability in the United States by contracting in the United States, and as a result of tens of thousands of securities trades being executed and settling in the United States, resulting in title to the securities passing in the United States.

53.     During the relevant period, GTM provided transition management services to, and took hidden TP on trades for, approximately 150 U.S. and international institutional customers, including funds managed on behalf of charities, religious organizations, retirement plans, universities, and governments.

54.     Just over 100 of those customers were domiciled in the United States.  In virtually every case, these U.S.-domiciled customers contracted with GTM via a TMA that bore the U.S. address of the customer and was signed by a U.S.-based employee.

55.     In a handful of cases, the TMAs did not bear a customer address, but also did not contain any indication that the U.S.-domiciled customer had executed the contract overseas.

56.     As a result of executing their TMAs in the United States, the U.S.-domiciled customers were in the United States when they committed themselves to the terms under which they would purchase or sell securities via GTM, and therefore incurred irrevocable liability in the United States.

57.      U.S.-domiciled customers almost always contracted with GTM using the standard TMA that was drafted by GTM and printed on GTM's New York letterhead.  The TMAs contained instructions that the customers could enter into the agreement by returning a signed copy to a specified New York address, New York fax number, or New York-based employee of GTM, or a combination thereof.

58.     The TMAs for U.S.-domiciled customers were then executed in New York by New York-based GTM employees under Bassily's supervision, and in numerous instances, by Bassily himself.  GTM thus was in the United States when it committed itself to the terms under which it would purchase or sell securities for customers, and therefore incurred irrevocable liability in the United States.

13

59.     Of the U.S.-domiciled customers with whom GTM contracted in the United States, there were approximately eight religious organizations, three charitable organizations, ten educational institutions, seventeen union pension funds, three local government entities, eighteen state or municipal pension funds, and three cemeteries, in addition to multiple private pension funds.

60.     Available business records indicate that in addition to incurring irrevocable liability in the United States, nearly all of the U.S.-domiciled customers also had securities trades that were executed and settled in the United States through GTM, in transactions on U.S. exchange and in off-exchange transactions, and CGM Limited took hidden TP on U.S. trades for most of those customers.  The execution and settlement of these trades in the U.S. meant that title to the securities passed in the United States.  According to the same records, GTM and CGM Limited also worked together to take hidden TP on many trades in foreign-issued securities for U.S.-domiciled customers.

61.     The remaining customers that were victims of the fraudulent scheme by Bassily and GTM were foreign entities, including sovereign wealth funds, public and private pension schemes, and governmental entities.

62.     While the foreign customers appear to have been overseas when they contracted with GTM, in some instances they were contracting with GTM in New York, and therefore GTM was in the United States when it committed itself to the terms under which it would purchase or sell securities for those customers, and therefore incurred irrevocable liability in the United States.

63.     In addition, available business records indicate that most foreign customers –
several dozen of them – had securities trades that were executed and settled in the United States
through GTM, and CGM Limited took hidden TP on U.S. trades for most of those customers.

64.     Even for the small handful of foreign customers that did not have U.S. trades and
may not have contracted with GTM in the U.S., GTM's deception of these customers remained
central to the scheme.  If any of these customers had learned the truth about GTM's business
practices and spread that information in the market, it could have ground the entire fraudulent
scheme to a halt.  This is particularly apparent in the case of Customer B, set forth in more detail
below, where Bassily directed employees to deceive one customer in order to protect GTM's
developing business in a particular country.  Having successfully concealed the truth about
GTM's business model, GTM subsequently was able to attract transitions business from multiple
customers in that country and was able to continue taking TP on their trades, including numerous
trades that were executed and settled in the United States.

65.     The fraudulent scheme that Bassily participated in and helped supervise involved
tens of thousands of securities trades.  According to available business records, during the
relevant period GTM's customers had over 49,000 securities trades that were executed and
settled in the United States via GTM – meaning that title to the securities passed in the United
States – with hidden TP totaling over $50 million being taken on over 35,000 of those trades.
Many of these U.S. trades were executed on U.S. exchanges, with the rest of the trades occurring
in other execution venues in the United States.

66.     Additionally, over $80 million in hidden TP was taken on over 29,000 trades
outside the United States for GTM customers, many of whom incurred irrevocable liability in the
United States, as set forth above.

15

## THE FRAUDULENT SCHEME TO HIDE THE PRACTICE OF TAKING TP

67.     Bassily understood that customers often were unaware of the practice of regularly taking TP and would fire GTM if they learned the truth.  Bassily knew or was reckless in not knowing this from, among other things, an incident he was aware of that occurred near the start of his employment with GTM in or about 2004, when a customer learned that TP had been taken on its securities transactions, promptly demanded a refund, and never used GTM again because of the undisclosed charges.

68.     Consequently, throughout the relevant period, Bassily knowingly or recklessly participated in a fraudulent scheme to conceal the truth from customers.  This scheme involved a number of different types of deceptive conduct designed to avoid raising questions that could lead customers to discover the practice of routinely taking TP on their trades and the use of affirmative misrepresentations and misleading statements to customers who did ask questions. This deceptive conduct left customers with a false impression with respect to the nature and amount of the costs they paid to have their trades executed.  As a result of the deception, GTM was able to continue doing business with these customers, including continuing to take TP on their trades, and GTM was able to solicit new customers and take TP on their trades.

69.     Bassily played an important role in this scheme due in part to his position.  During the relevant period, Bassily supervised GTM's client-facing sales staff, and he was also a former product specialist responsible for training the sales staff on the transition management process. As a result of his considerable interaction with customers and GTM's sales staff, Bassily was uniquely situated to understand the expectations, sensitivities, and degree of watchfulness that characterized each customer.  Accordingly, Bassily gained an understanding of how much TP could be taken on transitions for each individual customer without prompting that customer to

raise questions about GTM's performance, and Bassily communicated that information to traders at CGM Limited along with instructions on how much TP to take for each customer.  This information about customers' price sensitivity would not have otherwise been known to the traders at CGM Limited because they did not deal directly with GTM's customers.

***Misrepresentations to Customers Who Inquired About the GTM Business Model***

70.     To conceal the practice of routinely taking TP, Bassily helped to draft, explicitly approved, and ultimately directed subordinate employees to make certain misrepresentations and material omissions to customers who asked how ConvergEx was compensated for transition services after TP had been taken on their trades.  The objective and result of these misrepresentations was to keep the practice of regularly taking TP concealed from the customer and the market in general so that GTM could continue to obtain orders for securities transactions, which in turn could be routed to CGM Limited in order to take TP.

### Customer A

71.     Customer A, a major public pension fund in Asia, had a long-standing relationship with GTM pursuant to a transition management agreement that required GTM to obtain Customer A's agreement to effect transactions on a principal basis and take a "spread" (TP).

72.     In July 2010, a representative of Customer A sent an e-mail to Bassily's subordinate, Employee 1, and asked "if BNY Convergex is currently engaged in earning a spread on a principal basis."  Employee 1 responded that "some asset classes require trading to be undertaken on a principal basis, for example, Foreign Exchange."  This response, however, did not satisfy the representative of Customer A, and she persisted in her questions by asking,

"[o]ther than FX transactions, is there anything else that BNY Convergex can engag[e] on a

principal basis?"

73.     Employee 1 consulted Bassily and sought Bassily's approval on her proposed

response to the customer.

74.     In an email, Bassily approved of Employee 1's proposed response to Customer

A's inquiry and directed Employee 1 "[p]lease send on to" Customer A.  Pursuant to Bassily's

direction, Employee 1 emailed the response to Customer A's representative on or about July 24,

2010, which stated in part:

> We have the ability to engage in principal trading, however this is rarely used in
> our transition business . . . , and we can assure you that no principal trading has
> been carried out in any transition for [Customer A].
>
> Should it ever be necessary, prudent or strategically important to do so, we would
> always discuss and seek your approval.

75.     As Bassily was aware, this statement was false and misleading.  At the time of

this misrepresentation, CGM Limited, GTM's affiliate, had taken approximately $9.6 million in

undisclosed TP on trades effected on a riskless principal basis for Customer A.

76.     The representative for Customer A believed that Customer A only paid

commissions when GTM executed its transition management orders and it was important to the

representative for Customer A to know whether GTM or its affiliates took mark-ups or mark-

downs in addition to that.  Commissions, however, were only a small fraction of the charges that

Customer A paid to execute trades through GTM.  Indeed, for the trades Customer A placed with

GTM prior to July 24, 2010, Customer A paid approximately $600,000 in commissions, which

was dwarfed by the hidden TP taken on these trades, totaling approximately $9.6 million.

77.     Following this misrepresentation, Customer A paid GTM an additional $118,000

in agreed-upon commissions, while CGM Limited took approximately $4.5 million in additional,

18

concealed TP on Customer A's trades routed from GTM (of which approximately $1.7 million was taken on trades that were executed and settled in the United States, including trades in securities listed on U.S. exchanges).

### Customer B

78.     Customer B is a foreign pension fund that contracted with GTM to conduct multiple transitions.

79.     Customer B's TMA was executed on its behalf by an employee based in Customer B's home country, and a London-based GTM employee executed the agreement for GTM.

80.     Between May and June 2008, Bassily drafted and/or approved misrepresentations and misleading statements that were communicated to a transition management consultant who represented Customer B.  Customer B's consultant made specific and repeated inquiries to Bassily's subordinate, Employee 2, asking whether GTM — or any ConvergEx company — earned remuneration from transitions other than commissions.

81.     The misrepresentations drafted and/or approved by Bassily created a false impression that routing orders to an affiliate and taking TP was a possibility only under certain limited circumstances when needed to facilitate the execution of a difficult order and that it was difficult to determine the amount of TP taken in these circumstances.

82.     In an e-mail dated May 23, 2008, Customer B's consultant asked Employee 2 if he would confirm that GTM and its related parties had not received "any income or remuneration in excess of the agreed upon commission."  Knowing that a truthful response would reveal TP, Employee 2 wrote to Bassily that this inquiry was "my worst fear.  What do we say now?"

83.     Employee 2 further wrote that telling the customer the truth would be a problem because ConvergEx recently took "significant" TP on a transition for Customer B and if the consultant found out, he "would be unhappy, ruin the relationship . . . and kill [GTM's] developing . . . business" in a particular foreign market.

84.     After Customer B's consultant again asked Employee 2 "if related parties earned any remuneration and how such remuneration would arise," and then requested "information of any additional remuneration earned," Bassily helped to draft and approved the following false and misleading statement, which was emailed to Customer B's consultant on or about June 10, 2008:

> It appears that one of our related parties, depending on the local market, can act in a principal capacity to facilitate our transition executions in a timely manner.  In such cases, the party takes some positions onto its own inventory and unwinds them later.  Since the unwinding is done over a period of time and 'piecemeal', I am told it is very difficult, if not impossible to determine the profit or loss that may have resulted. . . . .

85.     The statement went on to explain that with respect to Customer B's transition between November and December 2007:

> . . . In order to complete and to avoid possibly incurring a large opportunity cost [CGM Limited] facilitated execution as above. In fact, due to the lengthy actual settlement process, they had open positions for a long time. These positions were their exposure and [Customer B] did not incur the impact of that.

86.     Bassily knew, or was reckless in not knowing, that these statements were false or misleading because: (a) Bassily was aware that TP was taken frequently as part of the GTM business model, and not on a limited basis to facilitate a trade; (b) Bassily knew that it was not difficult to track TP because he tracked TP taken on customer trades on a regular basis; (c) Bassily was aware that Customer B's transition between November and December 2007 was GTM's most profitable transition during that period and that CGM Limited had taken more than $3.2 million in TP in that transition alone because these facts were included in the TP reports that

were received by and written by Bassily; and (d) CGM Limited traded on a riskless principal basis and did not take trades into "inventory" or have "exposure" as a result of these trades.

87.     If Customer B's transition management consultant had known that CGM Limited was taking large amounts of TP in addition to the commission, the consultant would not have considered using GTM for Customer B's transition and would have stopped using GTM for its transition customers' business.

88.     After the misleading statement was made, Customer B continued to place orders for securities transactions with GTM.  GTM also continued to develop its business in that foreign market, obtaining transition orders from multiple customers in this market after the 2007 deception of Customer B's consultant, and taking millions of dollars in TP on securities trades for these customers.  This included multiple securities trades that were executed and settled in the United States, including trades in securities listed on U.S. exchanges.

### Customer C

89.     Customer C is a large Middle Eastern sovereign wealth fund.  GTM conducted multiple transitions and other securities transactions for Customer C pursuant to a TMA.  While a foreign-based representative of Customer C executed the TMA for Customer C, ConvergEx committed itself to the agreement in New York, where a New York-based executive signed the agreement.  The signed TMA was faxed to ConvergEx's New York office.

90.     On or about March 14, 2011, ConvergEx executed a buy order for Customer C for a German exchange traded fund ("ETF"), for which Customer C paid GTM approximately $3,700 in disclosed commission.  CGM Limited bought the ETF in the relevant market for approximately 63.76 Euro per share and then marked up the price and sold the ETF to Customer

C for approximately 63.80 Euro per share, which resulted in CGM Limited taking $53,039.04 in

undisclosed TP in addition to the disclosed commission that Customer C paid to GTM.

91.    On or about March 15 and 17, 2011, one of Bassily's subordinates, Employee 3,

notified Bassily by email that Customer C was "really unhappy" with the execution on this trade

and that Employee 3 needed "to explain briefly but convincingly what happened."

92.    Employee 3, who did not know about CGM Limited's practice of taking TP and

did not know that TP had been taken on Customer C's order, asked Bassily:

> Do you think the trading desk could have made a spread on the trade without us
> knowing?  . . . I know we are agency brokers and we are not making money on these
> trades but at the same time I want to make sure that we sort the issue with [Customer C's
> representative] without it affecting our transition business.

93.    Bassily responded by email, asking for the source of Employee 3's information.

94.    Employee 3 then copied Bassily on an e-mail in which Employee 3 wrote that

"we need to convince [Customer C] that we are not skimming off the top and that we just had a

bad execution day."

95.    Bassily did not correct Employee 3's false understanding about "spread" (TP) or

advise Employee 3 that he should not be trying to convince the customer that ConvergEx was not

"skimming off the top" because CGM Limited had, in fact, marked up the execution price

received from the local broker.  Rather, Bassily emailed Employee 3 and stated that this "might

contaminate our business on the manager transitions side" which "would be a tragedy."  Bassily

authorized Employee 3 to "level" with the customer by explaining the execution with detailed

information regarding the nature of the market and ConvergEx's trading capabilities.  The

explanation that Bassily authorized Employee 3 to provide to Customer C omitted any reference

to the $53,039.04 in TP as a factor in the price the customer received.  Bassily, who tracked TP

on a daily basis, knew, or was reckless in not knowing, that TP had been taken on Customer C's trade and that TP impacted the price received by Customer C.

96.     Employee 3 communicated the misleading explanation approved by Bassily to Customer C's relationship managers at a bank for the purpose of communicating the information to Customer C.

97.     CGM Limited subsequently took approximately $3.5 million in additional TP on trades for Customer C, of which approximately $600,000 was taken on trades that were executed and settled in the United States, including trades in securities listed on U.S. exchanges.  This was in addition to approximately $346,000 in agreed upon commissions that Customer C paid to GTM.

***TP Taken Opportunistically to Avoid Detection***

98.     Bassily took further steps to conceal the practice of frequently taking TP by communicating with CGM Limited traders to provide guidance on opportunistically taking TP in order to minimize the risk that customers would detect the charge and maximize the amount of TP that could be taken without detection.

99.     To this end, Bassily and others at GTM generally assessed the sensitivity of their customers to determine whether a particular customer was paying attention to price — that is, how the prices the customers were paying for trades compared to prices available in the market — and communicated that information to the CGM Limited traders.  CGM Limited then took less TP, or did not take TP at all, on trades for sensitive customers, in an effort at least in part to conceal that TP was being taken.

100.    For example, in a recorded call on or about March 1, 2011, Daspin explained to Bassily that a customer — Customer C, described above — was monitoring a trade by asking for

periodic updates on trade execution throughout the trading day, which meant the customer would likely be able to detect that TP was being taken on its trades.  As Daspin put it, this would prevent Bassily from "raping" the customer by taking large amounts of TP.

> Daspin:  … yes, it's a big piece of the liquidity, but that's not going to prevent me from completing [the trade], but it does prevent you from raping if you know what I mean.

> Bassily:  Why?

> Daspin:  . . . . First of all, the client according to your guy is asking for update.

101.    Later in the same recorded call, Bassily informed Daspin about an upcoming transition that "would be probably the biggest transition of the year."  Bassily said "I have to have this conversation with you offline," and that even though he and Daspin would be speaking with other colleagues about the trading strategy, "I'm just having this conversation just you and me."  Bassily then informed Daspin "I'm looking to get 10 million out of this trade."

102.    Bassily then explained to Daspin which transition consultants on the upcoming transition did and did not make a practice of requesting post-trade details that could reveal that CGM Limited had taken TP.  Daspin responded "when we take TP at the end of the day we know which names to focus less on."  Bassily agreed and reiterated, "I just want to have the ten million conversation just one-on-one with you."  After Bassily and Daspin further discussed ways of achieving Bassily's goal of taking $10 million in TP on the transition, Daspin said "Let's make a ton of money….I'm excited.  You're excited.  This is great."  Bassily responded: "I am.  I am.  Great."

103.    In a recorded call on or about March 2, 2011, Bassily and Daspin discussed a large transition for Customer C of a portfolio exceeding $1 billion in value.  After Daspin explained that CGM Limited had taken 24 basis points in TP on trades for Customer C, Bassily

said that "35 would have been a lot better than 24 .... but it is what it is."  Bassily then instructed

Daspin that as to the remaining trades for Customer C, "we're making out all right, but we really

need – we need, really, really, 3 million in the U.S. from you," meaning a total of $3 million in

TP on trades in the United States, "'cause that will take us up to, you know, like, say if we can

do, you know, seven and a half" million in TP on the whole transition.  Daspin and Bassily then

talked about whether Daspin could achieve these goals, with Bassily concluding that "I think it's

going to be doable," and reiterating to Daspin that "another, like, you know, 24, 25 basis points

is an ugly day."  As a result of this collaboration on how much TP should be taken, CGM

Limited took a total of approximately $6.7 million in TP on this one-day transition, with

approximately $2.2 million of that TP coming on trades that were executed and settled in the

United States, including trades in securities listed on U.S. exchanges.

104.    In certain instances when Bassily and others perceived the risk of detection to be

low, they communicated that information to traders at CGM Limited and directed them to take

more TP, in some cases even advising traders that they could mark up the customer's trade so

that the customer's price was the market high of the day (for a buy order) or the market low of

the day (for a sell order), where better prices could have been provided.  Bassily also directed

Daspin to take TP in a manner that would avoid customer scrutiny.  The end result of the

collaboration between Bassily and CGM Limited traders on customer sensitivity was that some

customers received worse execution prices than they would have received if the information

about the customers had not been shared.

105.    Similarly, prior to CGM Limited executing a trade, Bassily set goals for how

much TP he wanted to take on the trade and he communicated that to the traders in Bermuda.  In

this regard, the amount of TP taken was not necessarily based on the customer receiving better

performance, and Bassily pressured CGM Limited to take TP to meet his goals as much as possible.

106.    For example, in a recorded call on or about June 23, 2011, Daspin stated that volatility in the market helps for the "real plan" of taking TP and that a flat or "slightly up market with better performance" would not help reach Bassily's goals for TP.  Bassily told Daspin that Daspin could take more TP if he was able to explain the marked up price to the customer by "just fram[ing] that basically in the context of the market behavior."  Daspin said "I'll leave that for you to worry about.  How much do you want me to take?"

107.    On or about July 25, 2011, Bassily and Daspin spoke by telephone to discuss a new customer order for Customer E, the abandoned property fund of a U.S. state government.

108.    At the beginning of the recorded call, Bassily and Daspin mentioned the regulatory requirement of "best execution," with Bassily saying it was "number one."  Bassily and Daspin spent the remainder of the call, however, discussing how to maximize TP on the customer's trades.

109.    Bassily eagerly volunteered information about who Customer E was, laughing as he spoke:

> Bassily:        This is the – this is the State abandoned property. . . . people die and then --- like, this is like the property that nobody claims for ten years for the state.
>
> Daspin:        Right.
>
> Bassily:        And they just use the . . . .
>
> Daspin:         Is that what this is?
>
> Bassily:        Yeah.  This – this is the [state] office of unclaimed property.
>
> Daspin:        Oh, my God.  What a fucking homerun.
>
> Bassily:         Yes, so---

Daspin:         Oh, my God.

Bassily:        Yeah, people who die and, like, for ten years it stays in a bank account that's open.  All this property is given up to the state, and when the statute of limitations expires, which is either 10 or 11 years in the [state], they put it up for sale and then it becomes part of the – it goes to treasury, to their state treasury basically.

Daspin:         Oh, my God.

Bassily.         Yeah.

Daspin:         Oh, my God.  Okay.  Well, we'll – okay.  So we really can do whatever we want.

Bassily:        (laughing) Now you know.  Now you know.

110.    The two went on to discuss strategy for completing the transition, including portions to be executed in the U.S., where Daspin explained that they would be buying $20 million and selling $80 million in securities.

111.    Customer E had not agreed that, if GTM satisfied the regulatory "best execution" obligation, then GTM would be entitled to skim TP off Customer E's trade and keep it for itself, in addition to the commission.

112.    In a recorded call also on or about July 25, 2011, Bassily and Daspin discussed the transition for Customer E as well as a separate transition that, based on available business records, was for Customer F and involved trades in securities that were executed and settled in the United States, including trades in securities listed on U.S. exchanges.

113.    Customer F is a U.S.-domiciled charitable and fraternal organization.  Bassily and Daspin began the call by discussing this transition, with Daspin stating that "in the U.S. so far, and we have the rest of the day so the picture could change, but using the current highs and lows, we're at 27 basis points" of TP.  Bassily responded "You're kidding," and Daspin responded that

this amounted to $275,000.  Daspin went on to say "I'm happy to book that this afternoon.  And if there's higher highs and lower lows, we might be able to take some more."  Bassily responded "Yes, let's do that…..At least 275 for the U.S.  We really would like this 275 to be 400, right? …. But it is what it is."

114.    Customer F paid approximately $44,000 in commissions for its transition.  CGM Limited took approximately $571,000 in TP on the transition, including over $369,000 in TP on securities trades that were executed and settled in the United States, including securities listed on U.S. exchanges.

115.    Later in the same call, Daspin and Bassily discussed the transition for Customer E, the abandoned property fund.  Daspin told Bassily that Customer E's performance was currently 64 basis points below the portfolio's value at the market's close the previous day. Bassily responded "But like did we trade at places where – ah, cause in a way, we don't have a benchmark," reminding Daspin that there was a significant opportunity to take more TP because the customer did not have stringent performance expectations.  Daspin then explained how CGM Limited would use the market's highs and lows of the day to take more TP.

116.    Daspin then asked Bassily why some of Customer E's transition orders had been sent to the CES program trading desk in New York, instead of to CGM Limited, and Bassily explained that it was because "many positions are very, very small, and you would not be able to make a penny on them….so we kind of…" Daspin interrupted by saying "Just took the biggest ones," to which Bassily said "exactly."  In other words, Bassily had large orders for Customer E routed to CGM Limited because they provided opportunities for taking TP, while smaller orders, on which TP could not be taken without detection, were sent to the CES program trading desk in New York, where they were executed.

117.    Bassily finished the call by telling Daspin that for Customer E, Daspin "can be the low of the day, but, you know, not on every single stock…You know, ideally higher than the low," although "We're quite liberal" for Customer E.  Based on available business records, CGM Limited took approximately $79,000 in TP that day on securities trades for Customer E that were executed and settled in the United States.

118.    Similarly, in a recorded call on or about August 1, 2011, Bassily asked Daspin whether there would be "some room" on a U.S. trade that day for Customer G.  When Daspin said "tell me now what you want to take," Bassily said "[w]e'll take as much as we can, I mean, subject to good performance."  When Daspin asked what that meant, Bassily explained that in a pre-trade analysis, GTM had predicted that the customer's portfolio would experience a shortfall of $650,000 from its value at the time of the market's close the previous day, meaning that any shortfall up to that amount would be unlikely to prompt questions by Customer G.

119.    Based on available business records, CGM Limited ended up taking $550,000 in TP on Customer G's $95 million transition, which consisted entirely of securities trades that were executed and settled in the United States.  Customer G paid approximately $29,000 in commissions.

120.    Customer G is a U.S.-domiciled manager of mutual funds.  Customer G's TMA, which was addressed to Customer G's U.S. address, was executed by Customer G's U.S.-based CEO, and returned to GTM in New York, where it was countersigned by a New York-based GTM employee.

***Deceptive Conduct to Hide TP in a Transparent Market***

121.    Bassily also helped to hide TP by approving and encouraging Daspin to use a technological tool to hide broker identification for trades executed in a transparent foreign

market in order to take TP while minimizing the risk of detection by Customer D.   During the

relevant period, Customer D was the pension plan for a Delaware corporation whose operations

included offices in South Carolina, from which the pension plan was administered.  Customer

D's relationship with GTM and CES was governed by a TMA that was executed in December

2007.  Customer D committed itself to the terms under which it would engage in securities

transactions with GTM and CES by signing the TMA in South Carolina.  This is evidenced by

the South Carolina-based employee and address to which GTM addressed the TMA, and by the

signature of a different South Carolina-based official of Customer D on the TMA.

122.    For its part, GTM and CES committed to the terms of the TMA in New York.

The TMA is on GTM's New York letterhead, was signed by a New York-based GTM employee,

states that the contract is governed by New York law, and states that the terms of the TMA could

be accepted by returning a signed copy of the TMA to a New York-based GTM employee at a

New York address.

123.    Customer D had not requested anonymity in the execution of its trades.

124.    In a recorded call on or about June 17, 2011, Daspin explained to Bassily that he

was concerned about a GTM order for securities listed in Canada for Customer D  because,

"[i]t's all Canada and it's all transparent," meaning that for trades on the Canadian Securities

Exchange, unlike most securities exchanges, real-time trade execution data, including the

identity of the broker executing the trade, is available to the general public.  This meant that

GTM customers such as Customer D would be able to see the real prices obtained on their trades.

Daspin told Bassily that "focusing on how to hide myself best…is my priority.  Not anything

else.  Not cost, nothing.  I have to figure out how to hide myself."  Daspin explained that a

ConvergEx subsidiary had an algorithm that randomized trades between local Canadian brokers

and that Daspin also could present himself as "anonymous," both of which would impede GTM customers from learning that TP was being added to the prices obtained in their securities transactions.  Bassily responded enthusiastically to the use of the randomizer to execute the trade, saying, among other things, "Wow," and after discussing Daspin's plan for the transition and Bassily's goals for the amount of TP to be taken, Bassily ended the call by saying "Great plan.  I love it."

125.    CGM Limited took approximately $1.3 million in undisclosed TP on this trade for Customer D (in addition to disclosed commissions in the amount of about $43,000).

126.    After CGM Limited executed these trades for Customer D, Daspin reported to Bassily in a recorded call that one of the stocks did not perform well, but that he had an idea for how they still could take TP.

127.    Specifically, Daspin told Bassily that even though the stock did not perform well, since CGM Limited had executed a portion of the order earlier in the day when the price was better, they could falsely tell Customer D that they waited until the end of the day to execute the trade, hoping for a rebound in the price.

128.    Bassily expressed excitement, saying "I love this brilliant idea," and he urged Daspin to make sure that he was telling the other CGM Limited traders about ideas like this one. Bassily then told Daspin that ConvergEx senior management had reminded him that June 2011 was a critical month for GTM revenue and Bassily had promised management that he would not leave a "penny on the table" and that "we go to the edge."  Daspin replied that he would "push the envelope."  CGM Limited took approximately $47,000 in undisclosed TP on that trade for Customer D.

129.    CGM later took approximately $225,000 in additional TP on this customer's subsequent trades, in addition to over $70,000 in agreed-upon commissions Customer D paid to GTM.  Over $2,000 of that TP was taken on trades in securities that were executed and settled in the United States on one day in late June 2011.  For instance, one of the trades involved thousands of shares of a foreign issuer's American Depositary Receipts that were executed in the United States, on which GTM received a commission of 3 basis points, and on which CGM Limited took almost 33 basis points in TP.  Prior to the June 2011 use of the algorithm in Canada, Bassily and others at GTM and CGM had worked to take some $1.2 million in TP on securities trades for Customer D that were executed and settled in the United States.

130.    A representative of Customer D believed that ConvergEx earned only the stated commissions on open market trades and there were no other fees.  If Customer D had known about ConvergEx's practice of routinely taking TP on such trades, that information would have affected its decision to hire GTM.

### Deceptive Conduct to Prevent a Prospective Customer from Learning About GTM's Use of An Offshore Trader

131.    Bassily also engaged in deceptive conduct to prevent a prospective transition management customer in the Middle East from discovering that its trades would be executed by CGM Limited in Bermuda.  Revealing this could have led to questions to which truthful answers would have revealed that GTM was routing trades offshore in order to take TP.  The prospective customer asked to meet with the trader who would be handling its trades if it hired GTM, and Daspin was selected to accompany Bassily on the trip to meet the prospective customer.

132.    Bassily, however, did not want Daspin to provide the prospective customer with business cards that truthfully indicated that he was employed by CGM Limited in Bermuda, so

Bassily and another member of senior management sought to order new business cards that falsely stated that Daspin was employed by ConvergEx Group in New York.

133.    Bassily provided Daspin with the cards, which were provided to the prospective customer on the trip.

134.    In a recorded phone call on or about April 8, 2011, while preparing for the trip, Daspin explained to Bassily that the prospective customer might be able to look him up and see that he worked in Bermuda.

135.    Bassily responded by proposing a false statement that they could tell the customer:

> Let me think about that.  I mean, we could very well – we could say that we have a, you know, trading operation down in Bermuda.  You used to be based in Bermuda, right, but now you're based in New York. . . we can come up with something . . . most likely we'll go with the New York business card . . . I'd rather go with the New York business card and spin it….

### Misleading Marketing Materials

136.    As set forth above, GTM routinely routed transition management customer orders to its affiliate, CGM Limited, which charged undisclosed TP in addition to GTM's disclosed commission.  Despite this, from at least 2006 to 2011, GTM marketed itself as an "agency-only brokerage" that was "free of conflicts" and had a "very transparent" compensation structure. GTM represented that it "charges a stated agency brokerage commission, agreed with our client in advance," which "covers all functions of our transition management service," and it did not "charge any additional project management, operational or reporting fees."

137.    Bassily was well aware of how GTM marketed its services because he reviewed and approved many of GTM's marketing materials that contained these representations, including those set forth in the preceding paragraph.

138.    Bassily also personally drafted and communicated these statements to prospective customers.

139.    For example, on October 13, 2010, Bassily sent an email to a prospective foreign customer who had asked Bassily what features differentiated GTM from other transition managers.  In response, Bassily stated:

> … I also believe that we, ConvergEx, can add value because we can provide everything you mentioned and do it in an agency manner.  The fact that we are an agency-only brokerage firm aligns our interests with those of our clients.  This is a big differentiating factor….

140.    Bassily knew, or was reckless in not knowing, that this statement was false or misleading.  Despite claiming that ConvergEx was an "agency-only brokerage," Bassily knew that orders were routinely routed to GTM's affiliate, CGM Limited, which traded on a riskless principal basis and added an undisclosed mark-up or mark-down to the price of the security.

141.    In addition, on June 11, 2010, Bassily emailed language containing misrepresentations to a colleague for use in response to an inquiry from a prospective foreign customer.  The language provided by Bassily stated, in part:

> . . . all our trading activity is carried out on an agency basis whereby we trade on behalf of customers. We are bound by the guidelines governing best execution. The risks that a fiduciary contract safeguards against do not exist in an agency-only business model. In fact, we have chosen that model to operate our business because it is free of conflicts and aligns us totally with our customers. Our behavior does not change depending on the type of contract we enter.

142.    This misrepresentation was communicated to the prospective customer on or about June 15, 2010.

143.    Bassily knew, or was reckless in not knowing, that this statement was false or misleading.  Bassily knew that customers who requested "fiduciary" treatment received different treatment from GTM, as TP was not taken on trades for these customers.  Bassily also knew that

trades for non-fiduciary customers were routinely routed to CGM Limited, which traded on a riskless principal basis and added an undisclosed mark-up or mark-down to the price of the security.

144.    Similarly, on November 11, 2010, Bassily emailed language containing misrepresentations to a colleague for use in response to an inquiry from a prospective foreign customer, who had asked whether ConvergEx "will utilize its affiliates and are the cost of these affiliates accounted for and disclosed?"  Bassily provided the following misleading response to his colleague:

> We operate a global trading platform whereby we do not outsource trading to third parties.  We trade through our own execution desks.  Our execution desks utilize a mix of algorithms that are designed to minimize implementation shortfall and access global markets in the most efficient and timely manner.  We are an agency-only brokerage firm. We only trade on behalf of our clients and our mandate is to get best execution.  All the costs are accounted for in the form of the commission rate we have quoted.

145.    This misrepresentation was communicated to the prospective customer by email on or about November 16, 2010.

146.    Bassily knew, or was reckless in not knowing, that this statement was false or misleading.  Despite representing that ConvergEx acted on an agency-only basis, Bassily knew that GTM routinely routed orders to CGM Limited, which traded on a riskless principal basis and added an undisclosed mark-up or mark-down to the price of the security, resulting in customers receiving different prices for securities than those obtained by the local broker in the relevant market.  Further, Bassily knew that undisclosed TP was routinely taken on transition management trades, such that "[a]ll the costs" were not in fact "accounted for in the form of the commission rate."

## FIRST CLAIM FOR RELIEF

### Violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5]

147.     Paragraphs 1 through 146 are re-alleged and incorporated herein by reference.

148.     Through the conduct described above, Bassily violated Section 10(b) of the Exchange Act [15 U.S.C § 78j(b)] and Rule 10b-5 thereunder  [17 C.F.R. § 240.10b-5].

149.     Bassily, directly or indirectly, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated or would operate as a fraud or deceit upon any person.

150.     By reason of the forgoing, Bassily has violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### In the Alternative with Respect to Section 10(b) and Rule 10b-5(b):
### Violation of Sections 10(b) [15 U.S.C. § 78j(b)] and 20(b) of the Exchange Act [15 U.S.C. §78t(b)] and Rule 10b-5(b) Thereunder [17 C.F.R. § 240.10b-5(b)]

151.     Paragraphs 1 through 146 are re-alleged and incorporated herein by reference.

152.     Bassily violated Section 20(b) of the Exchange Act [15 U.S.C. § 78t(b)] by knowingly or recklessly drafting, approving and/or directing the communication of materially false and misleading information through or by means of employees under his management that

were intended to be, and were, communicated to brokerage customers in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

153.    By knowingly or recklessly communicating materially false and misleading information through or by means of employees under his management, Bassily, directly or indirectly, engaged in acts through or by means of any other person or persons that would have been unlawful for Bassily to do himself under Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

154.    Unless restrained and enjoined, Bassily will continue to engage in acts through or by means of third parties that would have been unlawful for Bassily to do himself under Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

### THIRD CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 Thereunder [17 C.F.R. § 240.10b-5] Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]**

155.    Paragraphs 1 through 146 are re-alleged and incorporated herein by reference.

156.    Through the conduct described above, CES, CGM Limited and Daspin, in connection with the purchase or sale of any security by use of the means or instrumentalities of interstate commerce, the mails, or any facility of any national securities exchange, directly or indirectly, knowingly or recklessly: (a) employed a device, scheme, or artifice to defraud; (b) made an untrue statement of material fact or omitted a material fact necessary to make the statement not misleading; or (c) engaged in an act, practice, or course of business which operated

or would operate as a fraud or deceit in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

157.    Bassily knowingly or recklessly provided substantial assistance to CES, CGM Limited and Daspin in their violations of Section 10(b) of the Exchange Act and Rule 10b-5. Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Bassily is deemed to be in violation of Section 10(b) of the Exchange Act and Rule 10b-5 to the same extent as CES, CGM Limited and Daspin, and unless enjoined, will again aid and abet violations of those provisions.

## FOURTH CLAIM FOR RELIEF

**Aiding and Abetting Violations of Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78o(c)(1)] Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)]**

158.    Paragraphs 1 through 146 are re-alleged and incorporated herein by reference.

159.    At all relevant times, CES was a registered broker-dealer pursuant to Section 15(b) of the Exchange Act [15 U.S.C. § 78o(b)].

160.    Through the conduct alleged above, CES by use of the mails or any means or instrumentality of interstate commerce effected any transaction in, or induced or attempted to induce the purchase or sale of, any security (other than commercial paper, bankers' acceptances, or commercial bills) by means of any manipulative, deceptive, or other fraudulent device or contrivance in violation of Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78o(c)(1)].

161.    Bassily knowingly or recklessly provided substantial assistance to CES in its violations of Section 15(c)(1) of the Exchange Act.

162.    Pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Bassily is deemed to be in violation of Section 15(c)(1) of the Exchange Act to the same extent as CES, and unless enjoined, will again aid and abet violations of that provision.

## FIFTH CLAIM FOR RELIEF

**Violations of Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1), (3)]**

163.    Paragraphs 1 through 146 are re-alleged and incorporated herein by reference.

164.    Through the conduct described above, Bassily, directly or indirectly, in the offer or sale of any security by use of the means or instruments of interstate commerce, or by use of the mails, (a) knowingly or recklessly employed a device, scheme, or artifice to defraud; and (b) knowingly, recklessly, or negligently engaged in a transaction, practice, or course of business which operated or would operate as a fraud or deceit upon the purchaser.

165.    By reason of the foregoing, Bassily has violated, and unless enjoined will again violate, Section 17(a)(1) and (3) of the Securities Act [15 U.S.C. § 77q(a)(1) and (3)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

A.    Finding that Defendant Bassily violated the federal securities laws and the Commission Rule alleged in this Complaint;

B.    Permanently restraining and enjoining Defendant Bassily from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, from violating, directly or indirectly, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder through or by means of any other person, as prohibited by Section 20(b) of the Exchange Act, from aiding and abetting any violation of Section 15(c)(1) of the Exchange Act [15 U.S.C. § 78*o*(c)],  and from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

C.      Ordering Defendant Bassily to disgorge all illegal profits obtained as a result of

his fraudulent misconduct, acts, or courses of conduct described in this Complaint, and to pay

prejudgment interest thereon;

D.      Imposing civil monetary penalties on Defendant Bassily pursuant to Section 20 of

the Securities Act [15 U.S.C. § 77t] and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)];

and

E.      Granting such equitable relief as may be appropriate or necessary for the benefit of

investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

Dated:  January 18, 2017

Respectfully submitted,


_____/s/ Tom Bednar_____
Thomas A. Bednar
Sarah L. Allgeier
U.S. SECURITIES AND EXCHANGE
COMMISSION
100 F St., N.E.
Washington, D.C. 20549-5985
202-551-6218 (Bednar)
202-772-9245 (Fax)
BednarT@sec.gov
AllgeierS@sec.gov

CERTIFICATE OF SERVICE

I certify that on January 18, 2017, a copy of the foregoing document was served upon all counsel of record via the Court's electronic filing system.


_____/s/ Tom Bednar_____
Thomas A. Bednar
Counsel for Plaintiff, Securities and Exchange Commission